THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HEREDITARY CHIEF WILBUR SLOCKISH, a
resident of Washington, individually and as
Hereditary Chief of the Klickitat/Cascade Tribe;                    CV-08-1169-ST
THE KLICKITAT/CASCADE TRIBE, a
confederated tribe of the Yakama Indian Nation;                    OPINION AND ORDER
CHIEF JOHNNY JACKSON, a resident of
Washington, individually and as Chief of the
Cascade Tribe; THE CASCADE TRIBE, a
confederated tribe of the Yakama Indian Nation;
CAROL LOGAN, a resident of Oregon;
CASCADE GEOGRAPHIC SOCIETY, an Oregon
nonprofit corporation; and MOUNT HOOD
SACRED LANDS PRESERVATION
ALLIANCE, an unincorporated nonprofit
association,

                        Plaintiffs,

        v.

UNITED STATES FEDERAL HIGHWAY
ADMINISTRATION, an Agency of the Federal
Government; UNITED STATES BUREAU OF
LAND MANAGEMENT, an Agency of the
Federal Government; ADVISORY COUNCIL ON
HISTORIC PRESERVATION, an Agency of the
Federal Government; and MATTHEW GARRETT,
Director of the Oregon Department of
Transportation, an Agency of the State of Oregon,

_____Defendants._____

STEWART, Magistrate Judge:

## **INTRODUCTION**

This case involves the U.S. Highway 26 Wildwood-Wemme highway widening project ("Wildwood-Wemme project" or "the project") near Mt. Hood, Oregon, which was substantially completed in 2008. Plaintiffs consist of individuals and organizations who seek to preserve, protect, and rehabilitate Native American sacred and cultural sites and historical and archaeological resources in the lands surrounding Mount Hood. They allege that defendants United States Federal Highway Administration ("FHWA"), United States Bureau of Land Management ("BLM"), Advisory Council on Historic Preservation ("ACHP"), and Matthew Garrett, the Director of the Oregon Department of Transportation ("ODOT"), violated the National Historic Preservation Act ("NHPA"), 16 USC §§ 470-470x-6, National Environmental Policy Act ("NEPA"), 42 USC §§ 4321-4347, § 4(f) of the Department of Transportation Act ("DTA"), 49 USC § 303, the public trust doctrine, the due process clause, and also committed a breach of fiduciary duty.

The federal defendants have filed a motion to dismiss (docket #28) asserting that this court lacks subject-matter jurisdiction because the case is moot and some of the plaintiffs lack standing. Alternatively, the federal defendants assert that several of plaintiffs' claims in the First Amended Complaint ("FAC") fail to state a claim upon which relief can be granted.

Plaintiffs concede that their public trust doctrine, due process, and fiduciary duty claims are deficient and seek leave to amend to cure these deficiencies. However, a response to defendants' motion to dismiss is not the proper vehicle to do so. *See* LR 7.1(b). Otherwise, plaintiffs assert this court has subject matter jurisdiction over their remaining claims.

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons that follow, defendants motion is GRANTED as to the Tenth, Eleventh, and Twelfth Claims and as to plaintiffs Slockish, Jackson, and the Klickitat and Cascade tribes.

## **STANDARDS**

Motions to dismiss under FRCP 12(b)(1) for lack of subject-matter jurisdiction generally take two forms. First, a defendant may facially attack the allegations in the complaint as insufficient to establish subject-matter jurisdiction. *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F2d 730, 733 (9th Cir 1979). "In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true." *Holt v. United States*, 46 F3d 1000, 1002 (10th Cir 1995).

Second, a party may go beyond the allegations in the complaint and attack the factual basis for subject matter jurisdiction. *Thornhill*, 594 F2d at 733. If a party factually attacks subject matter jurisdiction, then no presumptive truthfulness attaches to the factual allegations in the complaint. *Id.* In that instance, a court has wide discretion to allow additional evidence in order to resolve disputed jurisdictional facts under FRCP 12(b)(1). *Biotics Research Corp. v. Heckler,* 710 F2d 1375, 1379 (9th Cir 1983). Furthermore, a court's reference to evidence outside the pleadings does not convert the motion to a FRCP 56 summary judgment motion. *Id.* However, a court is required to convert a FRCP 12(b)(1) motion to dismiss into a FRCP 12(b)(6) or FRCP 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. *Augustine v. United States*, 704 F2d 1074, 1077 (9th Cir 1983).

Motions to dismiss for failure to state a claim pursuant to FRCP 12(b)(6) are governed by the standards recently enunciated in *Ashcroft v. Iqbal*, 129 S Ct 1937 (May 18, 2009), and *Bell Atl. Corp. v. Twombly*, 550 US 544, 555 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S Ct at 1949, quoting *Twombly*, 550 US at 555. In order to survive a motion to dismiss for failure to state a claim pursuant to FRCP 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*, quoting *Twombly*, 550 US at 570. Thus,

> [i]n keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id* at 1950 (the "*Twombly* two-step").

## FACTUAL ALLEGATIONS

### I.    Plaintiffs

Wilbur Slockish is a resident of the State of Washington and the hereditary Chief of the Klickitat Tribe, which is a confederated tribe within the Yakama Indian Nation. FAC, ¶ 4. He is a direct descendent of Sla-kish, a signatory to the 1855 Treaty between the United States and the confederated tribes of the Yakama Indian Nation. *Id*. Johnny Jackson is a resident of the State of Washington and the hereditary Chief of the Cascade Tribe. *Id*, ¶ 6. Together they claim harm, both as individuals and representatives of their tribes, from the damage to the cultural and historical resources located within the right-of-way of the Wildwood-Wemme project in which

they and their tribes have an interest. *Id*, ¶¶ 4(A), 6(A). They also claim injury, both individually and as representative of their tribes, from various procedural violations committed by defendants in the course of approving and carrying out the Wildwood-Wemme project, including the defendants' failure to consult with them as representatives of their respective tribes throughout the course of the project. *Id*, ¶¶ 4(B), 6(B).

The Klickitat and Cascade Tribes are confederated Tribes of the Yakama Indian Nation.[1] They both consider the Mount Hood area, including the region located within the project, to be a "traditional cultural property."[2] *Id*, ¶¶ 5, 7. They claim injuries identical to those suffered by their respective leaders. *Id*.

Carol Logan is a resident of Oregon and is of Native American ancestry. *Id*, ¶ 8. She is a member of the Mount Hood Sacred Land Preservation Alliance ("MHSLPA"). *Id*. Logan and the MHSLPA use the affected area of the Wildwood-Wemme project for cultural, religious, recreational, and aesthetic purposes. *Id*. Logan has engaged in advocacy to preserve and protect Native American sacred lands within the Mount Hood area since the 1980s. *Id*. She claims injury from the damage to the cultural and historical resources located in the project area. *Id*.

The Cascade Geographic Society ("CGS") is a nonprofit corporation based in Oregon. *Id*, ¶ 9. It is dedicated to preserving and promoting the cultural, historical, and natural resources

---

[1] The FAC only identifies the Klickitat tribe as a confederated tribe within the Yakama Indian Nation and also refers to it as the Klickitat/Cascade Tribe. Plaintiffs, however, have clarified in their briefing that there are actually two tribes at issue in this case, the Klickitat and Cascade Tribes, both of which are confederated tribes within the Yakama Indian Nation. For clarity, the court will refer to them as the Klickitat and Cascade Tribes.

[2] A "traditional cultural property" is one "'associate[ed] with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community.'" *Navajo Nation v. U.S. Forest Serv.*, 479 F3d 1024, 1029 (9ᵗʰ Cir 2007) (brackets in original), *panel decision reversed in part on reh'g en banc*, 535 F3d 1058 (9ᵗʰ Cir 2008), *cert denied*, 129 S Ct 2763 (2009), quoting National Register Bulletin 38: *Guidelines for Evaluating and Documenting Traditional Cultural Properties* (rev. ed. 1998), *available at* http://www.nps.gov/nr/publications/bulletins/pdfs/nrb38.pdf. Traditional cultural properties are eligible for inclusion on the National Register. *Id*.

5 - OPINION AND ORDER

of the Cascade Mountain Range and its rivers.  *Id.*  It coordinates preservation efforts with

Native Americans, descendants of pioneers, and other interested parties within this region.  *Id*.  It

also uses the area affected by the Wildwood-Wemme highway project for cultural, recreational,

and aesthetic purposes.  *Id*.  The CGS also claims injury due to the damage to cultural, historical,

and natural resources located within the project area.  *Id*, ¶ 9(A).

## II.    <u>Wildwood-Wemme Project</u>

The FHWA and ODOT widened U.S. Highway 26 from two to four lanes in the 1980s.

*Id*, ¶ 17.  That project included an environmental impact statement ("EIS") pursuant to NEPA.

*Id*.  Included in that project was the stretch of highway at issue here:  a bow-shaped right-of-way

adjacent to the Mountain Air Park subdivision and the Wildwood Recreation Area between the

villages of Wildwood and Wemme near the town of Welches.  *Id*, ¶¶ 1, 16-19.  This segment of

U.S. Highway 26 also includes within its right-of-way a section of the A. J. Dwyer Scenic Area,

located in the northeast corner of the Wildwood Recreation Area  which is owned by the BLM.

*Id*, ¶ 11.  Defendant ODOT owns the right-of-way for U.S. Highway 26.  *Id*, ¶ 13.

During the development of the EIS for the 1980s project, an archaeologist identified an

archaeological site located within the U.S. Highway 26 right-of-way as a potential stone toll-

booth for the historic Barlow Road.  *Id*, ¶¶ 16-17.  This road served as a final leg of the Oregon

Trail, bringing pioneers over the Cascades into the Willamette Valley.[3]  *Id*.  The archaeologist

also discovered a rock cluster adjacent to the project area in a corner of the Wildwood

Recreation Area.  *Id*, ¶ 18.  He examined this site as a potential pioneer or Native American

---

[3]  The Barlow Road was built by Samuel Barlow in 1845 as an alternative to the treacherous raft trip down the
Columbia river.  To recoup the costs of building the road, Barlow charged a toll, though the road never became profitable.  *See*
Kate Brown, Sec'y of State, Oregon Blue Book 345-46 (2009), additional information available at *Notable Oregonians*: *Sam
Barlow - Pioneer, Roadbuilder*, http://bluebook.state.or.us/notable/notbarlow.htm (last accessed, October 12, 2009).

gravesite but found no human remains. *Id.* The site was later examined by a Native American who identified the rock cluster as a burial cairn identifying surrounding graves, though without a grave beneath it. *Id.* During the 1980s project, ODOT negotiated an agreement with the now curator of CGS (who was then with a different organization) for the protection of certain historic, cultural, and natural resources, including the Barlow Road and potential toll booth, the rock cluster later identified as a burial cairn, the A. J. Dwyer Scenic Area, and stone pillars marking the beginning of Mountain Air Drive. *Id*, ¶ 19. All of these resources were preserved during that project and are within the area affected by the Wildwood-Wemme project. *Id.*

In 1998, citizens petitioned ODOT to widen U.S. Highway 26 east of Sandy, Oregon. *Id*, ¶ 21. They expressed concerns for safety because this stretch of highway did not include a center refuge lane for turns. *Id.* This ultimately led to the Wildwood-Wemme project. In August 2006, the FHWA and ODOT released a draft environmental assessment ("EA") regarding the project. *Id*, ¶ 23. The FHWA and ODOT selected as the "preferred alternative" the "widen to the north" alternative which would destroy the rock cluster/burial cairn, possibly damage the Barlow Road stone toll-booth, and impact a "third priority" segment of Barlow Road. *Id.* It also required significant tree removal, and other harmful landscape changes to areas within and adjacent to the A. J. Dwyer Scenic Area that the CGS believes contain other segments of the Barlow Road and that the Native American plaintiffs identify as traditional cultural property. *Id.*

The draft EA also included an archaeological report which was not disclosed to the public. *Id*, ¶ 24. This report made no reference to the possible toll-booth and failed to locate the rock cluster discovered during the 1980s project. *Id.* None of the individual or tribal Native

American plaintiffs were included in any notices associated with the EA, and none of the defendants ever consulted with any of the Native American plaintiffs concerning the significance of the rock cluster or other potential cultural resources located within the project area. *Id*, ¶¶ 24, 25. It also did not address any of the resources in the project area as § 4(f) resources under the DTA, 49 USC § 303. *Id*, ¶ 27.

On February 8, 2007, after public hearings and public comment, the FHWA and ODOT circulated a revised environmental assessment ("REA") and finding of no significant impact ("FONSI") for the project. *Id*, ¶ 28. None of the Native American plaintiffs were sent a copy of the REA, FONSI, or the cover letter to these documents which indicated the time line for challenging the REA. *Id*.

On February 15, 2008, Logan and CGS requested a new review of the Project under § 106 of the NHPA. *Id*, ¶ 29. Logan also notified the FHWA that the rock cluster had recently been vandalized. *Id*. FHWA responded on February 26, 2008, that the § 106 review prepared with the EA was satisfactory. *Id.* Also in February 2008, Logan and CGS requested that the ACHP advise FHWA that an adequate § 106 review was necessary for the project. *Id*, ¶ 31. In April 2008, the ACHP advised FHWA that no further action was necessary because project construction had already commenced and no "federally recognized" Indian tribes had come forward to express concerns. *Id*.

On February 28, 2008, the BLM issued a permit for tree removal to ODOT without conducting any analysis under NEPA or the NHPA. *Id*, ¶ 32. In late March of 2008, contractors began cutting trees including old-growth Douglas Fir within and adjacent to the A. J. Dwyer

Scenic Area, within the project area.  *Id.*  This operation was substantially complete by the end of March 2008.  *Id.*

On April 8, 2008, the FHWA published its Notice of Final Agency Actions regarding the project.  *Id*, ¶ 34.  That same month, Slockish and Jackson each sent a memo to ODOT, the FHWA, and the ACHP discussing the status of the A. J. Dwyer Scenic Area as a traditional cultural property to them and their people and the existence of burial grounds within the project area.  *Id*, ¶ 36.

On June 20, 2008, CGS filed two Notices of Intent to Appeal in the Oregon Land Use Board of Appeals ("LUBA").  One appeal was based upon ODOT's failure to seek review of the Project related to impacts on the Barlow Road.  *Id*, ¶ 38.  The other appeal was based on the failure of the Oregon Department of Environmental Quality to comply with Oregon's land use statute in permitting ODOT to undertake clearance, grading, and construction activities pursuant to an NPDES 1200-CA erosion and sediment control permit.  *Id*, ¶ 39.  LUBA dismissed both appeals on August 20, 2008.  *Id*, ¶¶ 38-39.  The Court of Appeals affirmed LUBA's final opinion and order on November 26, 2008.  *Id*, ¶ 39.

On July 7, 2008, Slockish, Jackson, and Logan filed a Notice of Intent to Appeal with LUBA based upon a claim that ODOT failed to comply with Oregon's land use statutes.  *Id*, ¶ 40.  LUBA dismissed this appeal on December 29, 2008.  *Id.*

Plaintiffs commenced this action on October 6, 2008.

///

///

///

9 - OPINION AND ORDER

### III.    Claims

#### A.    NHPA Claims

The First through Third and Sixth through Eighth Claims allege violations of the NHPA. The NHPA contains "a series of measures designed to encourage preservation of sites and structures of historic, architectural, or cultural significance."  *Penn Cent. Transp. Co. v. City of New York*, 438 US 104, 107 n1 (1978).  It establishes a National Register of Historic Places ("National Register") and  procedures for placing sites and structures on the listing.  16 USC § 470a.  Section 106, codified at 16 USC § 470f, requires federal agencies to "take into account the effect of any undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" prior to expending federal funds on or issuing any federal license for the project.  The § 106 review process consists of (1) identifying the resource that is eligible for listing on the National Register that would be affected by the federal undertaking; (2) determining if the effect could be adverse; and (3) if so, consulting with the State Historic Preservation Officer ("SHPO")[4] and other appropriate parties to develop alternatives to mitigate any adverse effects on the historic properties.  *Tyler v. Cuomo*, 236 F3d 1124, 1128-29 (9th Cir 2000), citing 36 CFR §§ 800.4(b) & (c) & 800.5(e); *see also* 36 CFR §§ 800.2 (parties to the § 106 process) & 800.3 (initiation of the § 106 process).[5]  A federal agency must ensure that the employees or contractors conducting this review meet professional standards established by regulation.  16 USC § 470h-4; 36 CFR § 800.2(a)(1).

---

[4]  The SHPO is a state official designated to assist federal agencies with their duties under the NHPA on projects in that state, and is involved in the § 106 consultation process.  16 USC 470a(b) & (c).

[5]  All citations are to the regulations in effect at the time the FHWA issued its Notice of Final Agency Action.

The NHPA affords specific protection to the properties of "Indian tribes" and requires the Secretary of the Interior to "establish a program and promulgate regulations to assist Indian tribes in preserving their particular historic properties." 16 USC § 470a(d)(1)(A). Once identified, these properties may be eligible for inclusion on the National Register and fall within the protection of § 106. 16 USC § 470a(d)(6)(A)-(B). The NHPA's implementing regulations require federal agencies to consult with Indian tribes about the effects of federal undertakings on historic properties of religious or cultural significance to those tribes. *See* 36 CFR §§ 800.2(c)(2) & 800.4(c)(1). Consultation with Indian tribes must occur even if the proposed project will take place on non-Indian lands. 16 USC § 470a(d)(6); 36 CFR § 800.2(c)(2)(ii); *see Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F3d 800, 806 (9th Cir 1999) (*per curiam*). The federal agency proposing a project subject to the NHPA must "make a reasonable and good faith effort to identify Indian tribes" to be consulted, 36 CFR § 800.2(c)(2)(ii)(A), and consultation must be "initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." 36 CFR § 800.1(c).

The NHPA established the ACHP to advise federal, state, and local agencies in carrying out their various duties under the act. 16 USC §§ 470i-j. Some of its duties include advising the President and Congress on matters relating to historic preservation, advising State and local governments as to guidelines for drafting legislation relating to historic preservation, and reviewing the policies and programs of federal agencies and recommending to those agencies methods to bring those policies and programs into greater alignment with the policies and programs created by the NHPA. 16 USC § 470j(1), (4) & (6). A federal agency undertaking an

action implicating the NHPA must give the ACHP an opportunity to comment on the action.  16

USC § 470f; 36 CFR § 800.9.  The ACHP also plays a role in resolving disputes that may arise

during the § 106 review process.  *See* 36 CFR §§ 800.4(d)(1) & 800.5(c).

The First Claim alleges that the FHWA and Garrett violated § 106 of the NHPA by

failing to consult with the Klickitat and Cascade Tribes to identify traditional cultural properties

located in the project area and by failing to take into account the effects of the project on these

properties.  The Second and Third Claims allege that the FHWA and Garrett violated § 106 of

the NHPA by failing to ensure that the archaeologist who examined the project area met relevant

professional standards.  As a result, defendants failed to identify resources eligible for inclusion

on the National Register, including the burial cairn and potential Barlow Road stone toll-booth,

and failed to properly consult with plaintiffs.  The Sixth Claim alleges that the ACHP also

violated § 106 of the NHPA by failing in its duty to advise FHWA and Garrett on the necessity

of consultation with the Native American plaintiffs as to whether the project area would affect

traditional cultural resources.  Finally, the Seventh and Eighth Claims allege that the BLM

violated § 106 of the NHPA by issuing the FHWA and ODOT a permit to cut trees located on

BLM-owned land and by approving a grant of right-of-way without engaging in the required

consultation and impact analysis.

B.    **NEPA Claims**

NEPA and its implementing regulations require federal agencies to file an EIS before

undertaking "major Federal actions significantly affecting the quality of the human

environment."  42 USC § 4332(C); *see* 40 CFR §§ 1500.1-1508.25.  An agency that believes its

action is not a "major Federal action," and therefore does not require the preparation of a full

EIS, may prepare a more limited environmental review, or EA, to determine whether the full EIS is necessary. 40 CFR § 1501.4(b) & (c). If the proposed action "will not have a significant effect on the human environment," the agency may issue a FONSI and need not complete an EIS. 40 CFR § 1508.13. NEPA is purely a procedural statute: "[it] does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Muckleshoot Indian Tribe*, 177 F3d at 814, quoting *Robertson v. Methow Valley Citizens Council*, 490 US 332, 350 (1989) (internal quotation marks omitted).

The Fourth Claim alleges that the FHWA and Garrett violated NEPA in numerous ways, including failing to prepare a full EIS, consult with the Native American plaintiffs, or identify property protected by the NHPA. In addition, the Seventh and Eighth Claims assert the BLM violated NEPA by granting the right-of-way and a tree-removal permits without preparing an EIS.

### C.   DTA Claim

Pursuant to § 4(f) of the DTA, "[i]t is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands . . . and historic sites." 49 USC § 303(a). Whereas the NHPA and NEPA impose only procedural requirements on federal projects, § 4(f) imposes a "substantive mandate." *N. Idaho Cmty. Action Network v. United States Dep't of Transp.*, 545 F3d 1147, 1158 (9th Cir 2008) ("*North Idaho*"). § 4(f) dictates that a federal transportation project "requiring the use of publicly owned land of . . . an historic site of national, State, or local significance" may be approved only if: "(1) there is no prudent and feasible alternative to using

that land; and (2) the program or project includes all possible planning to minimize harm to the . . . historic site resulting from the use." 49 USC § 303(c); *see North Idaho*, 545 F3d at 1158.

The Fifth Claim alleges that the FHWA and Garrett violated § 4(f) by failing to identify § 4(f) resources and by failing to minimize the project's impact on these resources.

**D.    APA Claim**

The Administrative Procedures Act ("APA") permits this court to "hold unlawful and set aside agency action, findings, and conclusions" which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 USC § 706(2)(A). The court's review under the APA is limited to "final agency actions." 5 USC §§ 702, 704.

The Ninth Claim alleges that the agencies' final action of adopting the EA, REA, and FONSI in violation of the provisions of law discussed above must be set aside. Although couched as a separate claim, the APA actually serves as the basis for this court's jurisdiction and delimits the scope of this court's review of the challenged actions. See *North Idaho*, 545 F3d at 1152 (noting that "the [APA] provides authority for the court's review of decisions under NEPA and Section 4(f) of the [DTA]"); *San Carlos Apache Tribe v. United States*, 417 F3d 1091, 1098-99 (9th Cir 2005) (holding that § 106 of the NHPA does not create a private right of action and, therefore, review is available only under the APA); *Neighbors of Cuddy Mountain v. Alexander*, 303 F3d 1059, 1065 (9th Cir 2002) ("*Cuddy Mountain*") (review of court decisions under NEPA is governed by the APA).

///

///

///

IV.    **Relief Sought**

Plaintiffs seek the following declaratory and injunctive relief:[6]

(1) a declaration that defendants have violated the NHPA, NEPA, and § 4(f) in carrying

out the project; and

(2) a preliminary and permanent injunction voiding the Wildwood-Wemme project EA,

REA, and FONSI, and ordering these be redone in compliance with the law; and

(3) a permanent injunction requiring defendants to:

> (a) consult with plaintiffs concerning the traditional cultural properties located in
>
> the project area;
>
> (b) comply with the NHPA including entering into Memorandum of Agreement
>
> ("MOA") with plaintiffs;
>
> (c) undertake appropriate remedial measures to address the damage to the
>
> traditional cultural property located within the project area; and
>
> (d) undertake an archaeological survey to properly identify the possible stone toll-
>
> booth;

FAC, pp. 27-29.

Plaintiffs also seek to recover their costs, attorney fees and any other just and equitable

relief.

///

///

///

---

[6] Plaintiffs also seek damages, but the remaining causes of action provide no basis for awarding them.

**DISCUSSION**

I.    **Subject-Matter Jurisdiction**

    A.    **Mootness**

        1.    **Legal Standards**

A federal court lacks jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 US 9, 12 (1992) (citations omitted).  A moot case is one which has "lost its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract propositions of law." *Hall v. Beals*, 396 US 45, 48 (1969); *see also H.C. ex rel. Gordon v. Koppel*, 203 F3d 610, 612 (9th Cir 2000) ("A case is moot where the issues before the court no longer present a live controversy or the parties lack a cognizable interest in the outcome of the suit."), citing *Murphy v. Hunt*, 455 US 478, 481 (1982).  "Mootness can be characterized as 'the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Cook Inlet Treaty Tribes v. Shalala*, 166 F3d 986, 989 (9th Cir 1999), quoting *United States Parole Comm'n v. Geraghty*, 445 US 388, 397 (1980).

When a case is challenged as moot, "'the question is not whether the precise relief sought at the time the application for an injunction was filed is still available.  The question is whether there can be *any* effective relief.'" *Nw. Env't'l. Def. Ctr. v. Gordon* ("*NEDF*"), 849 F2d 1241, 1244-45 (9th Cir 1988) § 4(f), quoting *Garcia v. Lawn*, 805 F2d 1400, 1403 (9th Cir 1986) (emphasis in *NEDF*); *see also Sierra Club v. United States Forest Serv.*, 93 F3d 610, 614 (9th Cir

1996) ("An action is moot if the court cannot grant any effective relief.") (quotation marks, citation omitted).  The Ninth Circuit has emphasized that "courts of equity have broad discretion in shaping remedies."  *Garcia*, 805 F2d at 1403.  Accordingly, the burden of demonstrating mootness is a "heavy one" and is born by the party claiming the case is moot.  *NEDF*, 849 F2d at 1244.

   2. <u>**Analysis**</u>

  Defendants assert that this case is moot because the Wildwood-Wemme project is substantially complete, and all of the remaining tasks are limited to areas already impacted by the project.  According to Richard Watanabe, the ODOT manager responsible for oversight of the design, development, and construction of the Wildwood-Wemme project, "only a small amount of work remains to be completed on the Project and all work that could have impacted any of the alleged cultural resources mentioned in [the FAC] was completed by early November 2008."  Watanabe Decl. (docket #28-3), ¶ 3.  The remaining tasks were to be completed by the end of July 2009 and would occur only within the already disturbed right-of-way of the project with no further impact any of the cultural resources identified in the FAC.  *Id*, ¶¶ 4-8.  Despite the project's completion, plaintiffs assert that this case still retains its character as a present, live controversy because the court is empowered to provide additional forms of relief.

  The Ninth Circuit has addressed the issue of mootness due to completion of a project numerous times.  In *Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F2d 585 (9th Cir 1981), the plaintiffs sued to enjoin the construction of a 500-kilovolt power transmission line across their lands, raising both substantive and procedural challenges to the project.  By the time of the appeal, all 191 towers required for the line had been built and the line was operational.

Nevertheless, the court concluded that the case was not moot because it could still grant effective relief to plaintiffs. "The building of the towers has not made the case hypothetical or abstract – the towers still cross the fields of the Landowners, continually obstructing their irrigation systems – and this Court has the power to decide if they may stay or if they may have to be removed." *Id* at 591 n1 (citations omitted). The court further observed that if a project's completion were enough to make the case moot, a federal agency "could merely ignore the requirements of NEPA, build its structures before a case gets to court, and then hide behind the mootness doctrine." *Id*. The court found that possibility "unacceptable." *Id*.

Many cases since *Columbia Basin* have held that the completion of a project was insufficient to moot a challenge to that project. *See Cuddy Mountain*, 303 F3d at 1065-66; *Cantrell v. City of Long Beach*, 241 F3d 674, 678-79 (9th Cir 2001); *Tyler*, 236 F3d at 1137; *West v. Sec'y of the Dep't of Transp.*, 206 F3d 920, 925 (9th Cir 2000); *NEDF*, 849 F2d at 1245. *NEDF, Cantrell*, and *West* are particularly instructive.

In *NEDF*, environmentalists sued several federal agencies over management procedures for the 1986 salmon fishing season. The district court dismissed the case as moot because the 1986 season had concluded. The Ninth Circuit reversed because possible remedies remained. Specifically, the court could order the 1989 management plan to allow more spawning because the salmon allegedly over-fished in 1986 would return to spawn in 1989. Allowing more spawning in 1989 would assure the preservation genetic characteristics of the salmon that spawned in 1986. "In a case such as this, where the violation complained of may have caused *continuing harm* and where the court can still act to remedy such harm by limiting its future adverse effects, the parties clearly retain a legally cognizable interest in the outcome." *NEDF*,

849 F2d at 1245 (emphasis added).  It did not matter that the plaintiffs had not specifically asked for injunctive relief as to the 1989 season because their request for "such other equitable relief as [the court] deemed necessary 'to repair any damages incurred'" was broad enough to include such a remedy.  *Id*.

*Cantrell* concerned a joint reuse plan by the Navy and State of California to lease a former naval base to a company which wanted to convert it into a marine container terminal. The navy base contained buildings listed on the National Register and habitat for several protected species of birds.  The plaintiffs challenged the reuse plan as violating state law and NEPA.  The district court found the plaintiffs lacked standing,  After the plaintiffs appealed, the historic buildings and bird habitats were destroyed.  Defendants argued the case was therefore moot.  The Ninth Circuit disagreed, concluding that the destruction of the specific buildings and habitat did not leave the plaintiffs without a remedy.  Instead, if the defendants were ordered to "undertake additional environmental review," it was possible that "defendants could consider alternatives to the current reuse plan, and develop ways to mitigate the damage to the birds' habitat . . . ."  *Cantrell*, 241 F3d at 678-79.  Thus, because effective relief was possibly available, the destruction of the station and habitat was "insufficient to render the case moot."  *Id* at 679.

In *West*, the plaintiffs challenged a two-stage highway interchange construction project, claiming that the FHWA violated NEPA by determining that the project satisfied a categorical exclusion from NEPA.  They sought a declaration that the project was not excluded and an injunction against further work on the project until a valid EIS was completed.  During the pendency of the litigation, Stage 1 of the project was completed and the interchange was opened to traffic.  As a result, the defendants argued that the case was moot.  The Ninth Circuit rejected

that argument, both because Stage 2 was not yet completed and because the court had "remedial

powers" to remand the case for additional environmental review and even to order the

interchange closed or taken down. *West*, 206 F3d at 925.

"The common thread in these cases" is the existence of a "continuing harm" after the

completion of the project where "the court can still act to remedy such harm by limiting its

future adverse effects." *Feldman v. Bowmar*, 518 F3d 637, 643 (9th Cir 2008), quoting *NEDC*,

849 F2d at 1245. The converse is demonstrated in *Feldman* where the lack of continuing harm

rendered a legal challenge moot. In *Feldman*, animal rights activists challenged a plan

implemented by the National Park Service ("NPS") to eradicate a non-native feral pig population

that was damaging the ecological and archaeological resources on Santa Cruz Island. Under the

plan, the agency chose to hire professional hunters to kill the pigs. The activists wanted NPS to

choose non-lethal methods of removal. They activists lost on the merits at the district court.

Before the appeal could be heard, the NPS eliminated the entire pig population. The Ninth

Circuit held that the case was moot because the court could give the activists no remedy now that

all the pigs were dead. Unlike the other cases, there was no secondary, continuing injury that the

court could alleviate. The only injury occurred when the pigs were shot; that injury was fully in

the past, and plaintiffs could not demonstrate "a remediable harm that effects [*sic*] their 'existing

interests.'" *Id* at 644.

Similarly, in *Sierra Club v. Penfold*,  857 F2d 1307, 1318 (9th Cir 1988), the court held a

challenge to certain mining actions was moot where the mining had been completed. Citing

*Columbia Basin*, the court found that "unlike a power transmission line, a completed mining

operation cannot be moved." *Id*. The impacts of the mines were "not remediable" because the court could not order the mines be "unmined." *Id*.

In view of these cases, the simple fact that the Wildwood-Wemme project is complete does not answer the question of whether this case is moot. Instead, the issue is whether that completed project causes continuing harm to plaintiffs' existing interest that can be redressed through equitable relief available under the APA.

According to defendants, the damage to plaintiffs' interests in the burial cairn, possible stone toll-booth, trees, and any other cultural or historical resources cannot be undone. Even if this court were to set aside the entire project and order defendants to restore U.S. Highway 26 to its pre-project dimensions, the damage to those resources would remain unabated.

Plaintiffs disagree. First, they argue that a legally sufficient NEPA and NHPA review, including consultations with plaintiffs, would document the precise character of the project as Native American traditional cultural property. They maintain that U.S. Highway 26 in the area of the project crosses portion of the Oregon Trail which followed trails used by Native Americans. Similarly, appropriate consultation with plaintiffs would reveal the precise character of the Barlow Road segments crossed by U.S. Highway 26 in the project area. Plaintiffs propose that remediation for these harms could include a revised landscaping plan that uses landscaping and interpretive markers to delineate these historic trails within the right-of-way owned by ODOT.

In addition, plaintiffs argue that appropriate consultation under the NHPA could reveal that the rock pile was in fact a burial cairn signifying that other unmarked Native American graves are in the area. Even though it is now destroyed, defendants could agree to place a

commemorative monument or other structure in its place.  Similarly, adequate consultation could demonstrate plaintiffs are correct about the stone toll-booth from the Barlow Road which defendants could choose to restore or, alternatively, could provide interpretive signage discussing the road.

Finally, as in *Schlessinger* and *Gordon*, plaintiffs point out that they broadly seek any other relief that this court deems necessary and appropriate, bringing this court's "broad discretion" to shape an equitable remedy to bear.

The court begins its analysis by assuming, as alleged in the FAC, that defendants have violated the NHPA, NEPA, and § 4(f) by failing to consult with plaintiffs on the project, by failing to identify the cultural and historical resources or attempt to mitigate the impact the project had on them, and by completing an inadequate environmental review.  This court also assumes that the cultural and historical resources identified by plaintiffs exist and that the project has had an adverse impact upon them.  *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F3d 18, 26 (1st Cir 2007) (beginning jurisdictional analysis with assumption that agency's actions violated federal obligations).  Based on these assumptions, this court has the power to grant plaintiffs some remedy.  That remedy includes enjoining further work on the project, as well as ordering removal of the offending portions of U.S. Highway 26.  The court also could order that defendants complete a new NEPA § 106 review and include consultation with defendants.  After this additional review, defendants may not reach the same conclusion or may be able to alleviate some of plaintiffs' injuries, for instance, by creating markers or monuments to designate and honor the now lost cultural and historical resources and those that still remain.

22 - OPINION AND ORDER

Contrary to defendants' assertions, plaintiffs do allege a continuing harm.  The expanded portions of U.S. Highway 26 still cross alleged cultural and historical property, possibly including an Native American burial site and portions of the historic Barlow Road.  Ground that was once undisturbed has been paved over.  While the specific markers plaintiffs allege were located in the project area may have been destroyed, the cultural and historical assets they demarcated may still remain.  This case is unlike *Feldman* where the only interest the animal rights activities possessed was in the method used to kill the feral pigs.  That interest was extinguished at the same time the pigs were exterminated.  Here, as in *Gordon, Cantrell*, and *West*, something of interest to plaintiffs remains despite defendants' destruction of the cairn and toll-booth, such that this court retains the power to provide some remedy.

Defendants also argue that much of plaintiffs' suggested relief is beyond the scope of this court's authority under § 706(2)(A) of the APA which only permits this court to "hold unlawful and set aside agency actions."  Much of the affirmative injunctive relief suggested by plaintiffs would only be available under APA § 706(1) which allows the court to "compel agency action unlawfully withheld or unreasonably delayed."  But in order to proceed under this provision, plaintiffs must establish that one of the defendant agencies "failed to take a discrete agency action that it [was] required to take."  *Norton v. S. Utah Wilderness Alliance*, 542 US 55, 64 (2004).  Plaintiffs have not pointed to any provision in the NHPA, NEPA, or § 4(f) that would require the defendants to provide such relief as remedial landscaping or erection of interpretive signage or monuments.

This argument is well-taken but ultimately irrelevant.  The court does have the power to order defendants to carry out additional review of the alleged cultural and historical resources in

the project area in compliance with the NHPA, NEPA, and § 4(f).  While defendants may

ultimately come to the same decision, it is also possible that they could agree to some of

plaintiffs' demands.  That possibility of effective relief is all that is required to establish that this

claim is not moot.  *NEDF*, 849 F2d at 1245.

      The NHPA, NEPA, and § 4(f) are powerful legal mechanisms intended to assure that

federal agencies analyze the impacts of their projects on the cultural, historical, and

environmental resources of our nation.  *See San Carlos Apache Tribe*, 417 F3d at 1097

(observing that "what § 106 of NHPA does for sites of historical import, NEPA does for our

natural environment"); *Apache Survival Coalition v. United States*, 21 F3d 895, 906 (9th Cir

1994) (finding the NHPA and NEPA "closely related" as "[b]oth are 'stop, look, and listen'

provisions . . . that are design[ed] to ensure that Federal agencies take into account the effect of

Federal or Federally-assisted programs") (internal and external citations omitted, brackets in

original).  They allow interested and affected members of the public to provide input to assure

that the agency has all the information needed to make an informed decision about a project's

impacts prior to undertaking the project.  These are key requirements in any federal project or

undertaking which cannot casually be set aside.  By failing to include key stakeholders in this

process, defendants may have acted without information necessary for them to comply with their

obligations under these provision.  This court will not reward defendants' efficiency in

completing the project by shielding them from their obligations under these provisions.  Thus,

defendants have failed to meet their burden to show that this case is moot.

///

///

///

///

**B.**     **Standing**

     **1.**     **Legal Standards**

Even if this case presents a live, present controversy, someone must have standing to

bring it.  Federal courts have developed a number of rules to determine whether a plaintiff has a

sufficient stake in a litigation to satisfy both constitutional and prudential limits on standing.

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of

Article III" of the U.S. Constitution.  *Lujan v. Defenders of Wildlife*, 504 US 555, 560 (1992).

To satisfy Article III standing requirements, a plaintiff must show that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized
> and (b) actual or imminent, not conjectural or hypothetical; (2) the injury
> is fairly traceable to the challenged action of the defendant; and (3) it is
> likely, as opposed to merely speculative, that the injury will be redressed
> by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.* , 528 US 167, 180-81 (2000).

"'To satisfy the injury in fact requirement, a plaintiff asserting a procedural injury must

show that the procedures in question are designed to protect some threatened concrete interest of

his that is the ultimate basis of his standing.'"  *Beeman v. TDI Managed Care Servs., Inc.*, 449

F3d 1035, 1038 (9th Cir 2006), quoting *Citizens for Better Forestry v. USDA*, 341 F3d 961, 969

(9th Cir 2003). "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that

they use the affected area and are persons 'for whom the aesthetic and recreational value of the

area will be lessened' by the challenged activity." *Friends of the Earth*, 528 US at 183, quoting

*Sierra Club v. Morton*, 405 US 727, 735 (1972).  In alleging procedural harm, a sufficient

"concrete interest" is established by alleging a "'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact.'" *Ashley Creek Phosphate Co. v. Norton,* 420 F3d 934, 938 (9th Cir 2005), quoting *Cantrell*, 241 F3d at 679, *cert denied*, 548 US 903 (2006). This nexus may be established by allegations and affidavits showing that the plaintiff uses the area threatened by a proposed action. *Id* at 939.

Because plaintiffs' alleged injuries are procedural in nature, the third prong of the standing test, redressability, is relaxed such that plaintiffs need not demonstrate that defendants would have reached a different decision upon additional review. Plaintiffs "need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Cantrell*, 241 F3d at 682. Instead, "[p]laintiffs alleging procedural injury . . . need to show only that the relief requested – that the agency follow the correct procedures – may influence the agency's ultimate decision of whether to take or refrain from taking a certain action." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F3d 1220, 1226-27 (9th Cir 2008). However, as recently cautioned by the Supreme Court, "[o]nly a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.'" *Summers v. Earth Island Inst.*, 129 SCt 1142, 1151 (May 19, 2009), quoting *Lujan*, 504 US at 572 n7 (emphasis in *Summers*).

Plaintiffs challenging an agency action under the APA must also meet the additional, prudential standing requirement of showing that their injury falls within the "zone of interest" the law in question was designed to protect. *Cantrell*, 241 F3d at 679. Defendants do not dispute that plaintiffs have satisfied this prudential standing requirement.

An organization may have standing to assert claims on behalf of its members.  To do so, it must show:  "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 US 333, 343 (1977); *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F3d 1141, 1147 (9th Cir 2000).  Thus, in order for the organization to be able to sue, at least some of its members must have suffered an injury as a result of the challenged conduct.

### 2.   **Analysis**

Defendants challenge the standing of Slockish, Jackson, the Klickitat Tribe, and the Cascade Tribe to bring claims under the NHPA, NEPA, or §4(f) for failure to allege a sufficient concrete interest, or geographic nexus, to the project area.  The court agrees.  None of these plaintiffs assert that they, or any other members of the tribe, have visited, used, or ever plan on visiting or using the traditional cultural resources that allegedly have been impacted by the project.  *See Ashley Creek*, 420 F3d at 938 ("Plaintiffs who use the area threatened by a proposed action or who own land near the site of the proposed action have little difficulty establishing a concrete interests."); *Nulankeyutmonen Nkihtaqmikon*, 503 F3d at 27-28 (finding that Native Americans who lived near and used the affected site for a variety of ceremonial and community purposes had established standing to challenge an action under NEPA and the NHPA).

Plaintiffs respond that the special nature of this property excuses them from the geographic nexus typically required in procedural injury claims.  Because the property at issue is a "traditional cultural property" of the tribes, they argue that any damage to the cultural

resources on that property necessarily injures the individual members of that culture.  This

"cultural injury," they argue, is sufficient to establish constitutional standing.  Plaintiffs cite no

legal support for this astoundingly broad assertion of standing.  If plaintiffs are correct, then any

Native American plaintiff can establish standing to challenge a project governed by any of these

statutes by simply asserting that the property involved constitutes a "traditional cultural

property" they believe their ancestors have used in the past, irrespective of whether that Native

American plaintiff ever plans on visiting or using the resource in question.  This court is not

aware of any case which countenances this expansive view of Native American standing.

*Summers* and other cases stand firmly against it.  *See Lujan*, 504 US at 564 (denying standing to

plaintiffs who could show only speculative "'some day' intentions" to visit endangered species

halfway around the world); *Sierra Club*, 405 US at 735 (holding that an organization lacked

standing where it failed to assert in its pleadings or affidavits that its members used the proposed

project area "for any purpose, much less that they use it in any way that would be significantly

affected by the proposed actions of the respondents").  As these cases demonstrate, Slockish,

Jackson, and their tribes, cannot assert a concrete interest in a cultural resource they believe to

exist but have never attempted to visit or view and have no immediate plans to visit in the near

future.

  Nevertheless, the court must still assess whether any party asserting the claims which

would otherwise be defeated by these findings, has standing.  Defendants have not challenged

the standing of Logan, the MHSLPA, or CGS.  If any of these parties have standing to bring any

of the claims that can be fairly read to assert a legal right they possess, that claim must survive

even though the remaining plaintiffs lack standing.  *Clinton v. City of New York*, 524 US 417,

28 - OPINION AND ORDER

431 n19 (1998) (because some plaintiffs had standing it was unnecessary to consider whether the

other plaintiffs also had standing), citing *Bowsher v. Synar*, 478 US 714, 721 (1986); *Village of*

*Arlington Heights v. Metro. Housing Develop. Corp.*, 429 US 252, 264 n9 (1977) (holding that

where one plaintiff has standing "we need not consider whether the other individual and

corporate plaintiffs have standing to maintain the suit"); *see also Nat'l Ass'n of Optometrist &*

*Opticians LensCrafters, Inc. v. Brown*, 567 F3d 521, 523 (9th Cir 2009) ("As a general rule, in an

injunctive case this court need not address standing of each plaintiff if it concludes that one

plaintiff has standing."), citing *Preminger v. Peake*, 552 F3d 757, 764 (9th Cir 2008).

All three of these parties claim they use the Wildwood-Wemme project area for cultural,

recreational, and aesthetic purposes. They also claim they have suffered injury by the damage

done to the cultural, historical, and – in the case of CGS – natural resources located within the

project area. These allegations are sufficient to establish individual standing. *See*, *e.g.*, *Montana*

*Wilderness Ass'n v. Frye*, 310 F Supp2d 1127, 1150-51 (D Mont 2004) (finding that Native

American who averred that he had personally visited sites of traditional cultural significance in

the project area and would do so in the future had standing to sue under both constitutional and

prudential requirements).[7]

However, more is required for the CGS to establish standing. To assert organizational

standing, it must allege the factors identified by *Hunt*, including that one of its members has

standing. It has failed to do so. Alternatively, the CGS could assert standing on the basis that

the organization itself has been injured. This would require the CGS to allege that defendants'

actions caused a concrete injury to its activities and a consequent drain on its resources apart

---

[7]   Because Logan is a member of MHSLPA and is a party to this lawsuit, this court need not separately analyze
MHSLPA's standing under the organizational standing criteria.

from this lawsuit.  *Havens Realty Corp. v. Coleman*, 455 US 363, 378-79 (1982); *Spann v. Colonial Village, Inc.*, 899 F2d 24, 27 (DC Cir 1990), *cert denied*, 498 US 980 (1990), *and cert denied*, 498 US 1046 (1991).  The CGS makes no such allegation.  Without proper allegations of organizational standing or injury to the organization itself, the CGS lacks standing to challenge the Wildwood-Wemme project.

Thus, of all the plaintiffs, only Logan has alleged sufficient facts to establish constitutional standing.  Her allegations also bring her within the prudential zone-of-interest requirement.  *See Montana Wilderness Ass'n*, 310 F Supp2d at 1150-51.  Because Logan has standing, this court has jurisdiction.

Although defendants have not challenged Logan's standing, in the context of challenging the other Native American plaintiffs' standing, they assert that none of the interests identified in the FAC (*e.g.*, burial cairn) are sufficiently concrete to serve as a sufficient interest to establish standing.  This court disagrees.  The fact that the precise natures of the burial cairn and other alleged historical or cultural resources eligible for protection are uncertain, does not defeat plaintiffs' claims.  The NHPA and its implementing regulations are intended not only to protect previously identified resources, but also to aid in the discovery of previously unknown or uncertain resources which are eligible for protection.  *See* 36 CFR § 800.4(b)(1) ("the agency official *shall* take the steps necessary to identify historic properties within the area of potential effects" including "make[ing] a reasonable good faith effort to carry out appropriate identification efforts." ) (emphasis added).  Indeed, one of the concerns motivating passage of the NHPA was that "historic properties significant to the Nation's heritage [were] being lost or substantially altered, often inadvertently . . . ."  16 USC § 470(3).  A party who believes the

agency's analysis was incomplete, resulting in the failure to identify and assess a historical or

cultural resource in which she personally has a concrete interest, has standing to challenge that

agency action even if the cultural resource at stake has not been clearly identified.

## II.    Legal Sufficiency of Claims

Even if this court has jurisdiction, defendants challenge the NHPA claims as failing to

state a claim on which relief can be granted.  In particular, they attack the First Claim that the

NHPA analysis was flawed because the FHWA and Garrett failed to consult with the tribes or

Native American plaintiffs.[8]  Defendants argue that they were under no obligation to consult

with the Klickitat or Cascade Tribes because they are not federally recognized tribes entitled to

consultation under the NHPA.  *See* 16 USC § 470w(4) (defining "Indian Tribe" or "tribe" as

used in the NHPA as "an Indian Tribe, band, nation, or other organized group or community . . .

which is recognized as eligible for the special programs and services provided by the United

States to Indians because of their status as Indians" ); 36 CFR § 800.16(m) (same); *Indian*

*Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian*

*Affairs*, 53 Fed Reg, No. 250, p. 52829 (Dec. 19, 1988) (notice) (listing eligible tribes).

The Klickitat and Cascade Tribes do not sufficiently allege that they are federally

recognized tribes.  However, the First Claim incorporates all the proceeding paragraphs which

include allegations pertaining to the other cultural resources and parties involved in this lawsuit.

FAC, ¶ 41.  Although not a model of clarity, the First Claim can be read as a claim brought not

---

[8]  This challenge is necessarily limited to the First Claim brought against the FHWA and Garrett.  The Second and Third Claims allege that the FHWA and Garrett failed to employ a qualified archaeologist resulting in a failure to identify the cultural and historical resources in the project area.  The Seventh, Eighth, and Ninth Claims allege that the ACHP and the BLM failed entirely in their duties under the NHPA and do not rest on any allegation of violating the NHPA by failing to consult with the tribes.

just by the tribes, but also by all plaintiffs, including Logan, who complain that the FHWA erred in leaving the Klickitat and Columbia Tribes out of the § 106 process.

Such a claim by a non-tribal member is not unprecedented. In *Montana Wilderness Ass'n*, a plaintiff alleged that the BLM's failure to consult several Indian tribes of which he was not a member violated the NHPA. The court held that the plaintiff had standing to assert that claim because he averred that his own Indian tribe had used the land and that he personally had visited sites of cultural significance in the area, and because the NHPA protects the right of "any member of the public who can demonstrate sufficient interest in the preservation of the historical lands at issue." *Id*, 310 F Supp2d at 1150-51.

Moreover, reading the FAC as a whole, the central grievance presented by the NHPA claims is defendants' inadequate § 106 analysis, resulting in their failure to identify the extant cultural and historical resources located within the project area. Although the FAC contains inartfully pled claims, and may even allege that defendants should have taken steps that they are not legally required to take, *i.e.*, consulting with the Klickitat and Cascade tribes, Logan has properly pled a claim under the NHPA. Additional amendment may be necessary to clarify the precise nature of the claim.

The fact that the tribes and their respective chiefs lack standing is not fatal to these claims. Logan has sufficient standing to assert the various claims at issue, given the broad class of individuals protected by the NHPA's procedural requirements and the requirement that pleadings be construed broadly in favor of plaintiffs on motion to dismiss. *Thomas v. Mundell*, 572 F3d 756, 760 (9th Cir 2009). At the pleading stage, the allegations by Logan are sufficient to survive a FRCP 12(b)(6) motion to dismiss.

///

///

## **ORDER**

Defendants' motion to dismiss (docket #28) is GRANTED, in part, as to the Tenth, Eleventh, and Twelfth Claims and plaintiffs Slockish, Jackson, and the Klickitat and Cascade Tribes. These claims and plaintiffs are dismissed without prejudice.

DATED this 13th day of October, 2009.

/s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge