IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

HEREDITARY CHIEF WILBUR SLOCKISH, a
resident of Washington and an enrolled member of
the Confederated Tribes and Bands of the Yakama
Nation, *et al*,

CV-08-1169-ST

               Plaintiffs,

FINDINGS AND
RECOMMENDATIONS

   v.

UNITED STATES FEDERAL HIGHWAY
ADMINISTRATION, an Agency of the Federal
Government, *et al*,

               Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

This case involves the U.S. Highway 26 Wildwood-Wemme highway widening project

("Project") near Mt. Hood, Oregon, which was substantially completed in 2008.  Plaintiffs

consist of the following three Native Americans and two organizations who seek to preserve,

protect, and rehabilitate Native American sacred and cultural sites and historical and archaeological resources in the lands surrounding Mount Hood:

(1) Wilbur Slockish ("Slockish"), Hereditary Chief and enrolled member of the Confederated Tribes of the Yakama Nation (Klickitat and Cascade ancestry);

(2) Johnny Jackson ("Jackson"), Hereditary Chief and enrolled member of the Confederated Tribes of the Yakama Nation (Klickitat and Cascade ancestry);

(3) Carol Logan ("Logan"), enrolled member of the Confederated Tribes of Grande Ronde;

(4) Cascade Geographical Society; and

(5) Mount Hood Sacred Lands Preservation Alliance.[1]

Plaintiffs allege that defendants United States Federal Highway Administration ("FHWA"), United States Bureau of Land Management ("BLM"), Advisory Council on Historic Preservation ("ACHP"), and Matthew Garrett ("Garrett"), the Director of the Oregon Department of Transportation ("ODOT"), violated the following federal laws:

(1) the National Historic Preservation Act, 16 USC §§ 470-470x-6 ("NHPA");

(2) the Federal Land Policy and Management Act, 43 USC §§ 1701-85;

(3) the Archaeological Resources Protection Act, 16 USC §§ 470aa-470mm;

(4) the Native American Graves Protection and Repatriation Act , 25 USC §§ 3001-13 ("NAGPRA");

(5) the National Environmental Policy Act, 42 USC §§ 4321-4347 ("NEPA");

---

[1] The Mount Hood Sacred Lands Preservation Alliance is listed in the caption, but is not otherwise mentioned in the SAC.

(6) § 4(f) of the Department of Transportation Act, 49 USC § 303 and 23 USC § 138; and

(7) the Administrative Procedures Act, 5 USC §§ 701-706 ("APA").

They also allege that defendants violated the due process clause of the Fifth Amendment to the U.S. Constitution, free exercise of religion under the First Amendment to the U.S. Constitution, and the public trust doctrine.

Plaintiffs commenced this action on October 6, 2008, and filed their First Amended Complaint on February 3, 2009 (docket #3). Defendants filed a motion to dismiss, which was granted in part without prejudice as to the public trust doctrine, due process, and breach of fiduciary duty claims as to plaintiffs Slockish, Jackson, the Klickitat Tribe, and the Cascade Tribe (dockets #48 and #52). Plaintiffs then filed a Second Amended Complaint ("SAC") on June 16, 2010 (docket #64). The Federal Defendants (FHWA, BLM, and ACHP) lodged the Administrative Record on October 28, 2010, sealed portions on November 18, 2010 (docket #86), and a supplement on March 7, 2011 (docket #91).[2] Plaintiffs filed their first Motion to Supplement Record and to Compel Discovery (docket #92) on March 29, 2011, which was denied as premature (docket #101).

Now pending before the court are three motions. First, to resolve some of the claims on which plaintiffs seek to supplement the administrative record, the Federal Defendants have filed a Motion for Judgment on the Pleadings (docket #104) against the SAC as to the constitutional claims (Twelfth and Thirteenth Claims) and the public trust doctrine (Fourteenth Claim). Second, Garrett has filed a Motion for Judgment on the Pleadings (docket #105) based, in part,

---

[2] The Administrative Record contains records from the Federal Defendants. References to this record will note the source of the record and the page number.

on immunity under the Eleventh Amendment.  Third, plaintiffs have filed a Renewed Motion to Supplement the Record and to Compel Discovery based on defendants' duties to complete an inventory and consider information from individual tribal members (docket #107).

For the reasons set forth below, the Federal Defendants' motion should be denied as to the constitutional claims premised on the free exercise of religion and otherwise should be granted; Garrett's motion should be granted; and plaintiffs' motion should be granted as to discovery related only to defendants' alleged duty to consult and otherwise should be denied.

## ALLEGATIONS

In the 1980s, FHWA and ODOT widened U.S. Highway 26 from two to four lanes.  SAC, ¶ 26.  That project included an environmental impact statement ("EIS") pursuant to NEPA.  *Id*. Included in that project was a bow-shaped right-of-way adjacent to the Mountain Air Park subdivision and the Wildwood Recreation Area between the villages of Wildwood and Wemme near the town of Welches.  This right-of-way includes a section of the A. J. Dwyer Scenic Area, located in the northeast corner of the Wildwood Recreation Area which is owned by the BLM. ODOT owns the right-of-way for U.S. Highway 26.  *Id*.

During the development of the EIS for the 1980s project, archaeologist Richard Pettigrew ("Pettigrew") identified an archaeological site located within the U.S. Highway 26 right-of-way as a potential stone toll booth for the historic Barlow Road.  *Id*.  This road followed a network of Indian trails and served as a final leg of the Oregon Trail, bringing pioneers over the Cascades into the Willamette Valley.[3]  *Id*, ¶¶ 21-22.  Pettigrew also discovered a rock cluster adjacent to

---

[3]  The Barlow Road was built by Samuel Barlow in 1845 as an alternative to the treacherous raft trip down the Columbia river.  To recoup the costs of building the road, Barlow charged a toll, though the road never became

(continued...)

4 - FINDINGS AND RECOMMENDATIONS

the project area in a corner of the Wildwood Recreation Area.  *Id*, ¶ 27.  He examined this site as

a potential pioneer or Native American gravesite but found no human remains.  *Id*.  The site was

later examined by a Native American (Wilfred Yallup, a Yakama elder) who identified the rock

cluster as a burial cairn identifying surrounding graves, though without a grave beneath it.  *Id*.

During the 1980s project, ODOT negotiated an agreement with Michael Jones ("Jones") (current

curator of the Cascade Geographical Society but who was then with a different organization) for

the protection of certain historic, cultural, and natural resources, including the Barlow Road and

potential toll booth, the rock cluster later identified as a burial cairn, the A. J. Dwyer Scenic

Area, and stone pillars marking the beginning of Mountain Air Drive.  *Id*, ¶ 28.  All of these

resources were preserved at that time and are within the area affected by the Project.  *Id*.

In 1998, citizens petitioned ODOT to widen U.S. Highway 26 east of Sandy, Oregon.  *Id*,

¶ 30.  They expressed concerns for safety because this stretch of highway did not include a center

refuge lane for turns.  *Id*.  This ultimately led to the Project at issue in this case.  In August 2006,

FHWA and ODOT released a draft environmental assessment ("EA") regarding the Project.  *Id*,

¶ 31.  FHWA and ODOT selected "widen to the north" as the "preferred alternative" although it

would destroy the rock cluster/burial cairn, possibly damage the Barlow Road stone toll booth,

and impact a "third priority" segment of Barlow Road.  *Id*.  It also required substantial tree

removal and other harmful landscape changes to areas within and adjacent to the A. J. Dwyer

---

[3](...continued)

profitable.  *See* Kate Brown, Sec'y of State, OREGON BLUE BOOK 345-46 (2009); additional information available at *Notable Oregonians*: *Sam Barlow - Pioneer, Roadbuilder*, http://bluebook.state.or.us/notable/notbarlow.htm (last accessed September 20, 2011).

Scenic Area that the Cascade Geographical Society believes contain other segments of the Barlow Road and that Slockish, Jackson, and Logan identify as traditional cultural property.  *Id.*

The draft EA also included an archaeological report by archeologist Patrick O'Grady ("O'Grady") which was not disclosed to the public.  *Id*, ¶ 32.  This report made no reference to the possible toll booth and failed to locate the rock cluster discovered by Pettigrew during the 1980s project.  *Id*.  None of the Native American plaintiffs or their tribes were included in any notices associated with the EA, and none of the defendants ever consulted with any of the Native American plaintiffs concerning the significance of the rock cluster or other potential cultural resources located within the project area.  *Id*, ¶¶ 32, 34.  It also did not address any of the resources in the Project area as § 4(f) resources under the Department of Transportation Act , 49 USC § 303.  *Id*, ¶ 33.

On February 8, 2007, after public hearings and public comment, FHWA and ODOT circulated a revised environmental assessment ("REA") and finding of no significant impact ("FONSI") for the Project.  *Id*, ¶ 35.  None of the Native American plaintiffs was sent a copy of the REA, FONSI, or the cover letter to these documents which indicated the time line for challenging the REA.  *Id*.

On February 15, 2008, Logan and the Cascade Geographical Society requested a new review of the Project under § 106 of the NHPA.  *Id*, ¶ 41.  Logan also notified FHWA that the rock cluster had recently been vandalized.  *Id*.  FHWA responded on February 26, 2008, that the § 106 review prepared with the EA was satisfactory.  *Id*.  Also in February 2008, Logan and CGS asked ACHP to advise FHWA that an adequate § 106 review was necessary for the Project.  *Id*, ¶ 43.

On February 28, 2008, BLM issued a permit for tree removal to ODOT without conducting any analysis under NEPA or the NHPA. *Id*, ¶ 37. In late March of 2008, contractors began cutting trees, including old-growth Douglas Fir, within and adjacent to the A. J. Dwyer Scenic Area. *Id.* This operation was substantially complete by the end of March 2008. *Id.*

On April 8, 2008, FHWA published its Notice of Final Agency Actions regarding the Project. *Id*, ¶ 39. On April 14, 2008, ACHP advised FHWA that no further action was necessary because construction had already commenced and no "federally recognized" Native American tribes had come forward to express concerns. *Id*, ¶ 43. Later that same month, Slockish and Jackson each sent a memo to ODOT, FHWA, and ACHP discussing the status of the A. J. Dwyer Scenic Area as a traditional cultural property to them and their people and the existence of burial grounds within the Project area. *Id*, ¶ 45.

On June 20, 2008, the Cascade Geographical Society filed two Notices of Intent to Appeal in the Oregon Land Use Board of Appeals ("LUBA"). One appeal was based upon ODOT's failure to seek review of the Project related to impacts on the Barlow Road. *Id*, ¶ 51. The other appeal was based on the failure of the Oregon Department of Environmental Quality to comply with Oregon's land use statute in permitting ODOT to undertake clearance, grading, and construction activities pursuant to an NPDES 1200-CA erosion and sediment control permit. *Id*, ¶ 52. LUBA dismissed both appeals on August 20, 2008. *Id*, ¶¶ 51-52. The Court of Appeals affirmed LUBA's final opinion and order on November 26, 2008. *Id*, ¶ 52.

On July 7, 2008, Slockish, Jackson, and Logan filed a Notice of Intent to Appeal with LUBA based upon a claim that ODOT failed to comply with Oregon's land use statutes. *Id*, ¶ 53. LUBA dismissed this appeal on December 29, 2008. *Id.*

Construction on the Project commenced the week of July 28, 2008, and was completed by approximately July 2009.  *Id*, ¶ 50.  The construction severely damaged the sacred burial grounds, buried the traditional campsite, covered and damaged the Native American trail/Barlow Road, and moved and damaged the stone pillars.  *Id*.  The newly constructed guardrails did not include the previous opening/break that had allowed access to the historic campsite, and access to the area from U.S. Highway 26 is now blocked.  *Id*.

## **FINDINGS**

### I. **Motions for Judgment on the Pleadings**

#### A. **Standards**

"After the pleadings are closed – but early enough not to delay trial –  any party may move for judgment on the pleadings."  FRCP 12(c).  "Judgment on the pleadings is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law."  *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F2d 228, 230 (9th Cir 1989), *cert denied*, 493 US 1079 (1990), citing FRCP 12(c).  "The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."  5C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE, § 1367 (3rd Ed 2004).

In ruling on a motion for judgment on the pleadings, district courts must accept all material allegations of fact alleged in the complaint as true and resolve all doubts in favor of the non-moving party.  *General Conference Corp. of Seventh-Day Adventists*, 887 F2d at 230. Judgment on the pleadings is improper if the district court must go beyond the pleadings to

resolve an issue. *Hal Roach Studios v. Richard Feiner & Co.*, 896 F2d 1542, 1550 (9th Cir

1989). Under such circumstances, summary judgment is the proper procedure. *Id.*

**B. Federal Defendants' Motion**

**1. Denial of Due Process Claim (Twelfth Claim)**

The Twelfth Claim alleges that in violating the various statutes and damaging the

resources, the Federal Defendants:

> have deprived Plaintiffs Slockish, Jackson and Logan of liberty
> interests without due process of the law as guaranteed by the Fifth
> Amendment to the U. S. Constitution. These liberty interests
> include the right to freely exercise their religion, the right to travel,
> the right to freely associate, and the right to maintain and express
> their traditional culture.

SAC, ¶ 88.

The Fifth Amendment imposes "constraints on governmental decisions which deprive

individuals of 'liberty' or 'property' interests." *Mathews v. Elridge*, 424 US 319, 332 (1976).

Due process limitations are "enforced against the States under the Fourteenth Amendment

according to the same standards that protect those personal rights against federal encroachment."

*Malloy v. Hogan*, 378 US 1, 10 (1964).

The Federal Defendants argue that plaintiffs have no liberty interest as alleged and, even

if they do, they received all process due them under the Fifth Amendment.

**a. Right to Travel**

The Supreme Court has recognized a fundamental right to interstate travel. *Attorney Gen.*

*of N. Y. v. Soto-Lopez*, 476 US 898, 903 (1986) (Brennan, J., plurality opinion). "The 'right to

travel' discussed . . . embraces at least three different components. It protects the right of a

citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 US 489, 500 (1999). Burdens placed on travel generally, such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not constitute a violation of that right. *Miller v. Reed*, 176 F3d 1202, 1205 (9th Cir 1999); *see also Kansas v. United States*, 16 F3d 436, 442 (DC Cir 1994).

Plaintiffs allege that the Federal Defendants violated their right to travel by destroying the resources that were the purpose of their travels and constructing a guardrail without the previous opening/break in the railing which prevents them from accessing the historic campsite in the A. J. Dwyer Scenic area. SAC, ¶ 50. Plaintiffs, however, have conflated their travel interest with their free exercise of religion interest. They have not identified any burden upon their ability to travel between states. the Federal Defendants' actions certainly may have adversely impacted their desire to travel into Oregon from another state for the purpose of visiting the area, but plaintiffs are still permitted to freely enter and move about Oregon. Because plaintiffs allege no infringement of their right to interstate travel, this portion of the due process claim should be dismissed.

### b. Right to Freely Associate

"[F]reedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *National Ass'n for Advancement of Colored People v. Alabama ex. rel. Patterson*, 357 US 449, 460 (1958) ("*NAACP*"). "In the domain of

10 - FINDINGS AND RECOMMENDATIONS

these indispensable liberties, whether of speech, press, or association, the decisions of this Court

recognize that abridgement of such rights, even though unintended, may inevitably follow from

varied forms of governmental action." *Id* at 461. "[T]he First Amendment protects those

relationships, including family relationships, that presuppose 'deep attachments and

commitments to the necessarily few other individuals with whom one shares not only a special

community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's

life.'" *Board of Dir. v. Rotary Club*, 481 US 537, 545 (1987), quoting *Roberts v. United States*

*Jaycees*, 468 US 609, 619-20 (1984); *see also Conti v. City of Fremont*, 919 F2d 1385, 1388-89

(9th Cir 1990). However, "[j]ust as in the community at large, reasonable regulations with respect

to the time, the place, and the manner in which [plaintiffs] conduct their speech-related activities

must be respected." *Healy v. James*, 408 US 169, 192-93 (1972).

Plaintiffs allege that they use the affected area of the Project for religious, spiritual,

cultural, and aesthetic purposes (SAC, ¶¶ 4-6, 25) which constitute the advancement of their

beliefs and ideas protected by the First Amendment. They argue that their association is familial

as their activities include meditation and prayer in the presence of their ancestors.

The alleged destruction of resources, however, does not result in an infringement on

plaintiffs' ability to associate. In *NAACP*, the government action in question was the compelled

disclosure of affiliation with a group engaged in advocacy. The NAACP showed that on past

occasions, the revelation of affiliation exposed its members to "economic reprisal, loss of

employment, threat of physical coercion, and other manifestations of public hostility." *NAACP*,

357 US at 462. The Supreme Court accordingly found that the required disclosure would violate

the First Amendment. Plaintiffs make no similar allegation here. While the site of the

campground may be inaccessible, they do not allege that they are unable to associate elsewhere for religious, spiritual, cultural and aesthetic purposes without risk of reprisal.

Plaintiffs' contention based on their right to maintain familial association through meditation and prayer with their ancestors is not supported by any case law. The right to familial association is discussed in the context of a parent being separated from his child who was his legal guardian. *Lee v. Los Angeles*, 250 F3d 668, 685 (9th Cir 2001) ("It is well established that a parent has a fundamental liberty interest in the companionship and society of his or her child."). Plaintiffs claim no such divisive or invasive action here.

Because plaintiffs cannot claim any denial of liberty based on their right to free association, this portion of their due process claim should be dismissed.

The Federal Defendants also suggest that any limitation of the plaintiffs' freedom to associate is within the appropriate restrictions of free speech. "In a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 US 781, 791 (1989) (quotation and citation omitted). The Federal Defendants argue that issues of public safety necessitated the guardrail limiting plaintiffs' access. Because plaintiffs have no claim based on their freedom to associate, this argument need not be addressed. In any event, it is unclear at this initial pleading stage whether the restrictions are, in fact, narrowly tailored.

///

///

12 - FINDINGS AND RECOMMENDATIONS

### c.  <u>Right to Maintain and Express Traditional Culture</u>

Describing the liberty interest of the Fourteenth Amendment, the Supreme Court has

denoted that:

> not merely freedom from bodily restraint but also the right of the
> individual to contract, to engage in any of the common occupations of life,
> to acquire useful knowledge, to marry, establish a home and bring up
> children, to worship God according to the dictates of his own conscience,
> and generally to enjoy those privileges long recognized . . . as essential to
> the orderly pursuit of happiness by free men.  In a Constitution for a free
> people, there can be no doubt that the meaning of "liberty" must be broad
> indeed.

*Bd. of Regents of State Colleges v. Roth*, 408 US 564, 572 (citations and quotations omitted).

Plaintiffs argue that this broad meaning of liberty can be extended to include their

asserted right to maintain and express their traditional culture.  This specific extension, however,

is not supported by any case law.  At its essence, plaintiffs are attempting to plead a First

Amendment claim as a denial of liberty interest claim based on their expression of traditional

culture.  That attempt should not be condoned, and this portion of the due process claim should

be dismissed.

### d.  <u>Right to Freely Exercise Religion</u>

As discussed below regarding the Thirteenth Claim, plaintiffs allege a cognizable claim

for interference with their free exercise of religion.  Thus, Slockish, Jackson and Logan also

allege a cognizable due process claim premised on a denial of a liberty interest arising from their

right to freely exercise their religion.

However, the Federal Defendants argue that even if some liberty interest was abridged,

plaintiffs were afforded all process due them under the Fifth Amendment.  To determine what

process is due, the court must balance "(1) the private interest affected; (2) the risk of an erroneous deprivation of that interest and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the burdens that additional procedural requirements would place on the state." *United States v. Phelps*, 955 F2d 1258, 1266 (9th Cir 1992), citing *Mathews*, 424 US at 331-32.

Plaintiffs allege that The Federal Defendants failed to provide adequate notice for their actions and violated several statutes, thereby denying them due process.  Whether the notice was, in fact, adequate is the heart of the parties' dispute and involves several factual issues that cannot be resolved on the pleadings.  Thus, judgment on the pleadings is not appropriate as to the due process claim premised on a plaintiffs' right to freely exercise their religion.

### 2.  Free Exercise of Religion Claim (Thirteenth Claim)

The Thirteenth Claim alleges as follows:

91.

In undertaking prayer, meditation, and other spiritual activities in the historic campground within the A.J. Dwyer Scenic Area, Plaintiffs Slockish, Jackson, and Logan were exercising their religion and engaging in religious activities.

92.

By violating the statutes referenced in the First through Eleventh Claims for Relief, ¶¶ 1-86; by damaging and destroying the historic campground through tree cutting and removing, grading, and ultimately burying the campground; and by blocking off access to the campground by installation of a new guardrail, the federal Defendants have substantially burdened and interfered Plaintiffs Slockish, Jackson and Logan's exercise of religion, with no compelling reason.

SAC, ¶¶ 91-92.

According to the First Amendment, "Congress shall make no law . . . prohibiting the free exercise [of religion]." "The Free Exercise Clause affords an individual protection from certain forms of government compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 US 693, 699-700 (1986). Government programs that have the incidental effect of "mak[ing] it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not violate the Free Exercise Clause or, by incorporation, the Fourteenth Amendment and, thus, do not require compelling justification. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 US 439, 450-51 (1988).

The purpose of the Religious Freedom Restoration Act ("RFRA") is "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 USC § 2000bb(b)(2). Because Slockish, Jackson and Logan allege that defendants "substantially burdened and interfered with [their] exercise of religion, with no compelling reason" (SAC, ¶ 92), their claim fits squarely within the RFRA and, as the parties concur, should be analyzed under that framework.

To establish a *prima facie* RFRA claim, a plaintiff must present evidence sufficient to allow a trier of fact rationally to find the existence of two elements. First, the activities that the plaintiff claims are burdened by the government action must be an "exercise of religion." 42 USC § 2000bb-1(a). Second, the government action must "substantially burden" the plaintiff's exercise of religion. *Id.*

> Under RFRA, a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their

> religious beliefs by the threat of civil or criminal sanctions.  Any burden
> imposed on the exercise of religion short of that . . . is not a "substantial
> burden" within the meaning of RFRA, and does not require the application
> of the compelling interest test set forth in those two cases.

*Navajo Nation v. U.S. Forest Service*, 535 F3d 1058, 1069-70 (9th Cir 2008) (citations omitted).

However, "the diminishment of spiritual fulfillment – serious though it may be – is not a

'substantial burden' on the free exercise of religion." *Id* at 1070.  If the plaintiff establishes a

substantial burden on his exercise of religion, then the burden of persuasion shifts to the

government to prove that the challenged government action is in furtherance of a "compelling

governmental interest" and is implemented by "the least restrictive means."  42 USC

§ 2000bb-1(b).  If the government fails to do so, the court must find a RFRA violation.

The Federal Defendants rely on *Lyng* to contend that plaintiffs cannot prove a substantial

burden on their exercise of religion.  The Native American plaintiffs in *Lyng* argued they were

burdened by the Forest Service's construction of a six mile paved road through Chimney Rock

Forest which contained important sites for religious rituals.  These rituals depended upon certain

qualities of the physical environment, the most important of which were privacy, silence, and an

undisturbed natural setting which would be adversely impacted by the presence of the road.  A

study commissioned by the Forest Service revealed that the road would have significant, though

largely indirect, adverse effects on Indian religious practices.  Nevertheless, the Supreme Court

found that the construction of the road did not coerce the plaintiffs from acting contrary to their

religious beliefs.  Moreover, it noted that the Forest Service had taken special ameliorative

measures ensuring that no sites where specific rituals take place were to be disturbed and selected

a route farthest from any of the contemporary sites.  "Except for abandoning its project entirely,

and thereby leaving the two existing segments of road to dead-end in the middle of a National Forest, it is difficult to see how the Government could have been more solicitous." *Id* at 455.

Here, in contrast, plaintiffs allege that they cannot freely access the site because of a newly constructed guardrail and destruction of the artifacts themselves.  SAC, ¶ 50.  In addition, plaintiffs also argue (but do not allege) that they would suffer criminal trespass should they attempt to access the site.  Based solely on plaintiffs' allegations which are assumed to be true, this court cannot conclude as a matter of law that the Project has not substantially burdened plaintiffs' free exercise of religion.  Without the artifacts and free access to the site, plaintiffs may be forced to act contrary to their religious beliefs.  In addition, this court cannot ascertain whether the Federal Defendants took the least restrictive means for implementing the Project and whether they followed all appropriate procedures.  As previously noted, fact issues also exist as to whether plaintiffs received procedural due process.  Due to these fact issues that must be resolved in order to determine if the burden on plaintiffs' exercise of their religion is substantial, the Federal Defendants' motion to dismiss the Thirteenth Claim should be denied.

### 3.  Public Trust Doctrine (Fourteenth Claim)

The Fourteenth Claim alleges that "BLM manages the resources in trust for the people of the United States, including the Plaintiffs . . . as citizens and as regular users of the A. J. Dwyer Scenic Area within the Wildwood Recreational Area, and has a duty to protect these resources. By violating the statutes . . . and by allowing these resources to be damaged and destroyed, Defendant BLM violated the Public Trust Doctrine."  SAC, ¶¶ 99-100.

///

///

The public trust doctrine serves to protect against inappropriate allocation of state land, particularly submerged lands, to uses that are against the public interest. *See Ill. Cent. R.R. Co. v. Illinois*, 146 US 387, 453 (1892). The public trust obligation for federal lands is limited. The Constitution declares that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. It follows that the federal government holds all the public lands of the nation in trust for the people of the United States. *Light v. United States*, 220 US 523, 537 (1911). It is "for Congress to determine" to which public purposes the trust should be dedicated. *Id.*

Congress has passed acts delegating authority to each of the three Federal Defendants in this action. *See* 16 USC § 470j(a)(1) (authorizing ACHP to "advise the President and the Congress on matters relating to historic preservation"); Federal Land Policy and Management Act, 43 USC § 1731 (authorizing BLM to manage public lands and resources); 49 USC § 104(c)(1) (authorizing FHWA to carry out "highway safety programs, research, and development related to highway design, construction and maintenance"). Thus, these federal agencies may determine to what public purposes the lands and resources at issue should be dedicated.

Moreover, plaintiffs concede that in the Ninth Circuit, the public trust doctrine has only been recognized with respect to the states, not to federal agencies. *Alaska Constitutional Legal Defense Conservation Fund v. Kempthorne*, 198 Fed Appx 601, 603 (9th Cir 2006). Thus, the Fourteenth Claim should be dismissed.

///

### 4. **Conclusion**

In sum, the Federal Defendants' Motion to Dismiss should be denied as to the Twelfth

Claim alleging a due process claim based upon deprivation of a liberty interest arising from the

free exercise of religion and as to the Thirteenth claim, and otherwise should be granted.

### C. **Garrett's Motion for Judgment on the Pleadings**

Plaintiffs allege claims against Garrett (excluding the Eighth, Ninth, Tenth, and

Fourteenth Claims) in his official capacity as Director of ODOT, an agency of the State of

Oregon, seeking prospective, declaratory, equitable, and injunctive relief for ongoing

constitutional violations.  SAC, ¶ 11.  Garrett seeks judgment against these claims based on his

immunity under the Eleventh Amendment and also against the Twelfth and Thirteenth Claims

based on a failure to state a claim for relief and qualified immunity.

### 1. **Waiver of Eleventh Amendment Immunity**

When a state official is sued in his or her official capacity, the suit is deemed to be against

the official's office and, thus, against the state itself.  *Will v. Michigan Dep't of State Police*, 491

US 58, 71 (1989).  As a result, suit against Garrett in his official capacity is no different than a

suit against the State of Oregon.

"The Eleventh Amendment bars suits against the State or its agencies for all types of

relief, absent unequivocal consent by the state.  The Eleventh Amendment jurisdictional bar

applies regardless of the nature of relief sought and extends to instrumentalities and agencies."

*Krainski v. Nev. ex rel. Bd. of Regents of Nev. System of Higher Educ.*, 616 F3d 963, 967 (9th Cir

2010) (internal quotations and citations omitted), *cert denied*, 131 S Ct 1678 (2011).  It "also

shields state officials from official capacity suits."  *Id* (citation omitted).

Plaintiffs argue that Garrett cannot assert Eleventh Amendment immunity because the

State of Oregon has consented to being sued under ORS 184.689 which states: "In order to carry

out the purposes set forth in ORS 184.685, the Department of Transportation may: (1) Sue and be

sued." Plaintiffs construe this statue as a waiver of sovereign immunity by the State of Oregon

for suits against ODOT, and hence to Garrett as ODOT's Director. In support of this

interpretation, plaintiffs point to similar language in the Postal Reorganization Act which made

the Postal Service amendable to suit. *United States Postal Serv. v. Flamingo Indus. (USA) Ltd.*,

540 US 736, 744 (2004). However, *Flamingo Indus.* is distinguishable because it addresses a

federal agency rather than a state agency and waiver of sovereign immunity. More on point is

*Florida Dep't of Health and Rehabilitative Services v. Florida Nursing Home Ass'n*, 450 US

147, 150 (1981), where the Supreme Court determined that the "sue and be sued" language in a

state statute did not constitute a waiver.

Thus, the State of Oregon has not clearly waived its Eleventh Amendment rights for suits

against Garrett in his official capacity as ODOT's Director.

## 2. **Injunctive Relief**

Whether Garrett is immune from suit under the Eleventh Amendment rests on the nature

of the relief requested. Under the principle of *Ex Parte Young*, 209 US 123 (1908), private

individuals may sue state officials for prospective relief against ongoing violations of federal law.

*National Audubon Soc'y, Inc. v. Davis*, 307 F3d 835, 847 (9th Cir 2002); *Krainski*, 616 F3d at

967-68 (internal quotations, citation, and emphasis omitted). "[W]hen a plaintiff sues a state

official alleging a violation of federal law, the federal court may award an injunction that governs

the official's future conduct." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 US 89, 102-03 (1984).

On the other hand, the Eleventh Amendment bars injunctive relief that requires a state official to expend funds to remedy a past violation. "[A] federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 US 651, 677 (1974) (citation omitted); *Ford Motor Co. v. Dep't of Treasury*, 323 US 459 (1945). "[C]ompensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 US 64, 68 (1985). Nonetheless, "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury." *Papasan v. Allain*, 478 US 265, 278 (9th Cir 1986). Relief is barred if it "is tantamount to an award of damages for past violation of federal law, even though styled as something else." *Id*, citing *Green*, 474 US at 69-70.

Plaintiffs seek injunctive relief requiring Garrett "to undertake appropriate remedial measures, including but not limited to landscaping, and interpretative markings and signage to address the damage to the sacred, historic, cultural and natural resources . . .;" and"uncover the historic campground, restore it through appropriate plantings and landscapes, and return it to use for religious purposes." SAC, p. 37, ¶ (4)(c) & (e). Plaintiffs characterize this relief as prospective in order to remedy on ongoing violation, while Garrett characterizes it as a remedy for past conduct.

The Supreme Court has attempted to define when injunctive relief is remedial, as opposed to prospective, under the Eleventh Amendment. In *Papasan*, the plaintiffs sought to enjoin a breach of the state's continuing trust obligation. Plaintiffs characterized the legal wrong to be addressed as a continuing obligation to comply with trust obligations, but the Court disagreed. It held that this relief was remedial and barred by the Eleventh Amendment because it sought recovery on an accrued liability based on a past breach of trust. In contrast, the Court determined that plaintiffs' equal protection claim was not barred by the Eleventh Amendment because the ongoing disparity in the allocation of school funds "is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*. " 478 US at 282.

Similarly, in *Edelman*, the issue was how to characterize relief for an accrued monetary liability. The Court determined that a claim to recover lost benefits due to allegedly improper processing of applications was barred because the damages were "measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 US at 668.

Here the relief sought is to remedy a discrete act, namely the construction of a road and destruction of significant cultural and religious objects. Although plaintiffs pray for an injunction to remedy an ongoing violation, they seek to restore a destroyed site. As in *Papsan* and *Edelman*, plaintiffs seek to impose liability and award relief for past acts and not to modify current and future agency action. In addition, that relief would necessarily require the expenditure of state funds to accomplish. Although interpretative markings and signage may cost little, the payment of funds to restore the site as alleged would not merely have an ancillary effect on the state treasury. *See Papasan*, 478 US at 278.

22 - FINDINGS AND RECOMMENDATIONS

Plaintiffs also argue that the "other and further relief" they seek could include prospective relief.  For example, the court could order Garrett to adopt policies to ensure compliance  with Native American consultation requirements for not only the Project which has been completed, but for all of ODOT's current and future highway projects, perhaps as part of a Programmatic Memorandum of Agreement with the other parties to this case.  However, plaintiffs do not challenge any current or ongoing ODOT policy, any systemic disregard for the applicable law, or any ongoing violation of constitutional rights that can be remedied by an injunction.  Instead, this lawsuit is aimed only at alleged failures with respect to the Project and its damage to historic and sacred resources.

Thus, the injunctive relief sought against Garrett is barred by the Eleventh Amendment.

### 3. **Declaratory Relief**

Plaintiffs also seek an order declaring that Garrett has:

> a) violated the statues referenced in this Complaint;
> b) deprived Plaintiffs Slockish, Jackson, and Logan life, liberty, and property without due process of  law;
> c) interfered with Plaintiffs Slockish, Jackson, and Logan's right to the free exercise of religion; and
> d) violated the public trust.

SAC, p. 36.

Under the  Declaratory Judgment Act of 1934, 28 USC § 2201, "declaratory relief may be available even though an injunction is not."  *Green*, 474 US at 72.  However, the court has the discretion to issue a declaratory judgment which "may depend upon equitable considerations, and is also 'informed by the teachings and experience concerning the functions and extent of federal judicial power.'"  *Id* (citations omitted).  Exercising that discretion, the Supreme Court declined

to award a declaratory judgment in *Green* because it "would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment. . . . [A] declaratory judgment is not available when the result would be a partial 'end run' around our decision in *Edelman*."  474 US at 73.

Relying on *Green*, Garrett argues that declaratory relief is barred in this case by the Eleventh Amendment because there is no ongoing state action at issue.  Instead, all claims involve a single act that occurred in the past, namely the widening of a specific section of U.S. Highway 26 with no allegation that ODOT intends to conduct any similar activities on the site in the future.

Plaintiffs assert the harm is on-going and the relief is prospective.  However, as discussed above, the substance of desired relief shows it is not prospective, but remedial for harms created by past acts.  Thus, just as in *Green*, awarding declaratory relief would result in an end-run around established law.

#### 4. **§ 1983 Claims**

Plaintiffs argue that they can bring the Twelfth and Thirteenth Claims against Garrett for violations of their constitutional rights pursuant to 42 USC § 1983.  That statute allows a plaintiff to seek damages against a state official in his or her personal capacity for past violation of federal constitutional rights.  However, an officer acting in his official capacity is not a "person" under § 1983.  *See Will v. Michigan*, 491 US 58, 70-71 (1989).  In addition, there is no *respondeat superior* theory of liability under § 1983.  *Monell v. Dep't of Soc. Serv. of City of N. Y.*, 436 US 658, 691 (1978).  Instead, "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights.  Liability under

§ 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998).

Plaintiffs allege only that Garrett acted in his official capacity.  They do not allege that he acted in his personal capacity or allege any facts that Garrett's actions directly caused their alleged constitutional deprivation.  Instead, they allege that ODOT violated their rights by failing to notify them, failing to conduct adequate inventories, removing a campsite, and restricting access to the site.  These allegations are insufficient to maintain a § 1983 claim against Garrett.

### 5. Conclusion

Garrett's motion should be granted against all claims.

## III. Plaintiffs' Motion to Supplement the Record

In their initial Motion to Supplement the Administrative Record and to Compel Discovery (docket #92), plaintiffs sought to provide affidavits and testimony to establish affirmatively their own cultural and religious use and interest in the property, the specific liberty interests they allege, and the exercise of religion they allege.  In addition, they sought the opportunity to submit evidence and take depositions of witnesses in order to rebut conclusions and assertions made by defendants, including what defendants did or did not do to complete an inventory, and to fill holes in the Administrative Record regarding the procedural and substantive adequacy of defendants' consultation with Native American tribes and/or tribal members.

The court dismissed this motion as premature and allowed plaintiffs to file a renewed motion addressing the need for supplementing the record in connection with defendants' alleged duties to inventory and consult.  Plaintiffs then filed their Renewed Motion to Supplement the Record (docket #107).

A.  **Discovery Under the APA**

Under the APA, judicial review of an agency decision is generally limited to the administrative record on which the agency based the challenged decision.  *Lands Council v. Powell*, 395 F3d 1019, 1029 (9th Cir 2005).  As explained by the Supreme Court, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'"  *Florida Power & Light Co. v. Lorian*, 470 US 729, 743-44 (1985), quoting *Camp v. Pitts*, 411 US 138, 142 (1973).

Expansion of the administrative record is allowed in only four narrowly construed circumstances:  "(1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency."  *Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F3d 1125, 1131 (9th Cir 2010) (citations and quotations omitted).

In the Ninth Circuit, when claims are brought under NEPA, the relevant factors considered for expansion of the record include environmental concerns such as whether the agency "neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative or otherwise swept stubborn problems or serious criticism . . . under the rug."  *Animal Defense Council v. Hodel*, 840 F2d 1432, 1437 (9th Cir 1988) (citation and quotations omitted).  In NEPA cases, "a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored."  *Id* (citations omitted).

26 - FINDINGS AND RECOMMENDATIONS

In their first motion, plaintiffs asserted that they are entitled to supplement the record for the following reasons:  (1) under the NEPA exception; (2) the need to fill gaps in the record, and (3) to show bad faith.

### 1. __Duty to Inventory (First Claim)__

Plaintiffs' First Claim alleges that "FHWA, BLM and Garrett failed to conduct adequate historic and cultural inventories" for the Project:

> in violation of the National Historic Preservation Act, 16 USC § 470a *et seq.* ("NHPA"), the Archeological Resources Protection Act, 16 USC § 470aa *et seq.* ("ARPA"), and the Native American Graves Protection and Repatriation Act, 25 USC § 3001 *et seq.* ("NAGPRA") . . . despite the fact that for approximately three decades the Plaintiffs in this case, and others, have assiduously and responsibly alerted and informed FHWA, BLM, and ODOT, the agency supervising Garrett, of the resources and activities occurring within the site at issue in this Complaint.

SAC, ¶¶ 55-56.[4]

To supplement the record regarding this duty, plaintiffs appear to rely on at least two of the exceptions to the APA record rule.  First, they argue, under the NEPA exception, that defendants consciously ignored and failed to investigate thoroughly the presence of Native American traditional burial grounds because it would be an inconvenient obstacle to a highway project.  Although the First Claim does not allege a violation of NEPA, the Sixth Claim (legally deficient EA,) alleges that by violating the NHPA "as detailed in the First through Fifth Claims," FHWA and Garrett also violated NEPA.  In their renewed motion, plaintiffs also argue that the

---

[4] Plaintiffs argue that defendants also had a duty to inventory under the FLPMA, but the SAC does not allege any failure to inventory under that statute.

Federal Defendants have failed to conduct the required inventory and seek discovery to "fill this gap."

Defendants respond that none of the acts cited by plaintiffs impose any duty to inventory on them. Even if they did, they contend that the Administrative Record contains sufficient details and descriptions of the Project to comply with any such duty.[5]

Even assuming that defendants had a duty to inventory,[6] plaintiffs have not shown how supplementation of the record is necessary. Discovery as to whether defendants have met the duty would not fill any gaps or provide any meaningful information. Either defendants performed the required inventory, which would then be found in the Administrative Record, or they did not. Defendants concede that they did not perform the inventory that plaintiffs claim they should have performed. With this question answered, plaintiffs may proceed with their First Claim alleging that defendants violated their duty to inventory without any need to further supplement the record.

.            **2.  Failure to Consult (Third Claim)**

Plaintiffs' Third Claim alleges that "FHWA, BLM, and Garrett failed to engage in adequate formal consultation with the Confederated Tribes and Bands of the Yakama Nation, a federally recognized Indian tribe" and "with the Plaintiffs in this case as interested parties"

---

[5]  The Administrative Record contains the following: Pettigrew's 1985 and 1986 reports (FHWA AR 159-64, 302-12); O'Grady's 2005 and 2006 reports (FHWA AR 2411-54, 3368-80); FONSI request for the Project in June 2006 (FHWA AR 3813-27); tribal monitor request and reminder emails (FHWA AR 5351, 5666); email chain regarding tree clearing and discussion of Logan's concern about the Project (FHWA AR 5726-29); email with update on February 2008 preconstruction meeting (FHWA AR 5972-73); and email with an update including a discussion of tribal interest in the Project (FHWA AR 6458-59).

[6]  The Federal Defendants do not seek judgment on the pleadings as to the First Claim.

regarding all aspects of the Project, "including but not limited to inventory, determination of eligibility for and inclusion in the National Register of Historic Places, taking into account the effects of the undertaking and mitigation strategies," in violation of NHPA and NAGPRA.  SAC, ¶¶ 60-62.

To supplement the record regarding this duty, plaintiffs appear to rely on both the NEPA exception and a need to fill gaps.  As previously noted, the Sixth Claim for violation of NEPA is based on violations of NHPA as alleged in the First through Fifth claims.  The Federal Defendants dispute that plaintiffs are owed this duty and argue that, in any event, they complied with that duty.

### a.  <u>NHPA</u>

NHPA requires, prior to any federal undertaking, that a federal agency to "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and "afford [ACHP] . . . a reasonable opportunity to comment with regard to such undertaking." 16 USC § 470f.  It also requires a federal agency to make a reasonable and good faith effort to identify historic properties, 36 CFR § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 CFR § 60.4; assess the effects of an "undertaking" on any eligible historic properties found, 36 CFR §§ 800.4, 800.5, 800.9(a); determine whether the effect will be adverse, 36 CFR §§ 800.5, 800.9(b); and avoid or mitigate any adverse effects, 36 CFR §§ 800.8(e), 800.9.

Another NHPA provision specifically applies to Indian tribes:  "In carrying out its responsibilities under Section 106, a Federal Agency shall consult with any Indian Tribe . . .  that

attaches religious and cultural significance to properties."  16 USC § 470a(d)(6)(B).  In addition,

the views of the public are "essential to informed Federal decisionmaking."  36 CFR

§ 800.2(d)(1).

> The agency official shall seek and consider the views of the public in a
> manner that reflects the nature and complexity of the undertaking and its
> effects on historic properties, the likely interest of the public in the effects
> on historic properties, confidentiality concerns of private individuals and
> businesses, and the relationship of the Federal involvement to the
> undertaking. . . .  The agency official must, except where appropriate to
> protect confidentiality concerns of affected parties provide the public with
> information about an undertaking and its effects on historic properties and
> seek public comment and input.  Members of the public may also provide
> views of their own initiative for the agency official to consider in
> decisionmaking.

36 CFR § 800.2(d)(1)-(2).

"Thus, any member of the public who can demonstrate sufficient interest in the

preservation of the historical lands at issue falls within the zone of interests protected by the

NHPA."  *Montana Wilderness Ass'n v. Fry*, 310 F Supp2d 1127, 1151 (D Mont 2004).

A preliminary issue is whether plaintiffs have standing under the NHPA to assert a duty

by FHWA and BLM to consult with them either as members of a federally recognized tribe or as

interested parties.  Plaintiffs clearly are permitted to submit affidavits and declarations outside

the Administrative Record to support their interest in and use of the site for the purpose of

establishing standing under NHPA.

The issue of standing aside, the Federal Defendants contend that they fully complied with

any duty to consult because they considered all information submitted by plaintiffs.  They cite the

letters dated January 31 and February 26, 2008, in the Administrative Record from FHWA to

Jones and Logan.  FHWA AR 5943-45; 5962-64.  The February 26, 2008 letter details ODOT's

efforts to notify the public about the project, noting four newsletters, open houses, and a public

hearing prior to the EA.  Information was printed in the community newspaper *Mountain Times*

and posted on a public website.  The letter also points out that both Jones and Logan were sent

invitations by certified mail.  It further explains that the site is "not eligible for the National

Historic Register because it lacks integrity of location, design, feeling, association, and

worksmanship in connection with the Barlow Road's period of significance.  In addition, the

stone pillars are not eligible for the National Register or as Clackamas County landmarks."

FHWA AR 5944.  The Administrative Record also includes notes about meetings with tribal

leaders dated in January and February 2008.  FHWA AR 5958-59.

Plaintiff respond that not all of them were consulted and that the site should be on the

National Register.  They seek to supplement the record with evidence of what information

ODOT considered, or at least possessed, from Slockish, Jackson, and Logan prior to the EA.[7]

Jones is prepared to testify about his meetings prior to generation of the EA with officials of,

*inter alia*, ODOT and FHWA in which he specifically mentioned Slockish, Jackson, and Logan

as individuals likely to have knowledge of, or concerns with, historic properties in the area, and

identified issues relating to the undertaking's potential effects on historic properties in the A. J.

Dwyer Scenic Area.

The record clearly demonstrates that at least Jones and Logan had the opportunity to

comment on the Project.  However, it is unclear as to what efforts were made to consult with all

of the Indian tribes that attach religious and cultural significance to the property, including at

---

[7] At this juncture, it is unclear whether that information was or should have been communicated by ODOT to the federal agencies or whether ODOT is deemed to be an agent of the federal agencies.

least Slockish and Jackson as Chiefs of two allegedly affected tribes. Thus, supplementation of

the record should be permitted by plaintiffs as to whether the Federal Defendants complied with

their duty to consult with all affected tribes and interested parties under NHPA.

**b. <u>NAGPRA</u>**

An implementing regulation of NAGPRA requires consultation "as part of the intentional

excavation or inadvertent discovery of human remains, funerary objects, sacred objects, or

objects of cultural patrimony on Federal lands." 43 CFR § 10.5. Specifically, "consultation must

seek to identify traditional religious leaders who should also be consulted and seek to identify,

where applicable, lineal descendants and Indian tribes . . . affiliated with the human remains,

funerary objects, sacred objects or objects of cultural patrimony." 43 CFR § 10.5(b)(3). Even

though defendants found no human remains at the site, plaintiffs argue that defendants

intentionally ignored information that the A.J. Dwyer Scenic Area contained an ancient Native

American trail and an associated campsite, burial grounds, and cairn marking the location of

surrounding burial cairns. SAC, ¶ 24(B).

The Federal Defendants respond that they properly acted on the knowledge of the burial

site, investigated the claims, and determined that there was no significant impact in moving

forward with the Project. The record includes Pettigrew's 1988 report explaining that the

possibility of burial at the rock cluster was extremely remote and required no further

investigation. FHWA AR 302. O'Grady reported on June 10, 2005, that the Project had been

closely watched because of anticipated cultural traces. FHWA AR 2412. O'Grady noted that the

rock cluster was not relocated at the time and repeated Pettigrew's conclusion that the rock

cluster "did not have any archeological significance and was not worthy of protection or

mitigation." FHWA AR 2414. In addition, the Federal Defendants consulted with the

Confederated Tribes of the Grande Ronde, the Confederated Tribes of the Siletz Indians, and the

Confederated Tribes of the Warm Springs prior to the REA and the FONSI in 2005 and 2006.

FHWA AR 5674-75. The Confederated Tribes of the Grande Ronde provided a tribal monitor

and was aware of Logan's concerns when the tree cutting began in 2008. FHWA AR 5726–28.

The current staff and leadership for the Yakama Indian Nation were consulted later in April 2008

and raised no concerns that the Project would impact Indian burials. FHWA AR 6425–33, 6544,

7274–75, 7495. The FHWA's tribal consultations and considerations of historic and cultural

resources were reviewed and approved by the ACHP. FHWA AR 6139, 6571–73.

  While the Administrative Record shows that defendants did consult some tribes and tribal

members, it still has gaps. It is unclear why some tribes were not consulted prior to the EA, why

the Yakama tribe was contacted in April 2008 only after construction began, what was discussed

at meetings with tribal members,[8] what burial sites were identified by the late Wilfred Yallup

(former Chair of the Yakama Indian Nation) at his 1991 deposition,[9] and how and what

information from ODOT was communicated to the federal agencies. Plaintiffs should be

permitted to supplement the record as to these issues regarding defendants' alleged failure to

consult as required by NAGPRA.

_____

  [8] Plaintiffs point to the lack of notes from a meeting between ODOT staff and the Warm Springs Tribe. FHWA AR 3180, 3798. Plaintiffs wish to learn which tribal elders attended that meeting and what was said.

  [9] Jones and attorney Michael Nixon attended that deposition and are prepared to testify that Mr. Yallup indicated on a map that the Dwyer property (later the A. J. Dwyer Scenic Area) was a location of native American gravesites. *See* FHWA AR 5565-5613, 5321, 5333. Jones submitted a copy of the deposition transcript, but without the map, to the Federal Defendants in March 2008, after the FONSI was issued. ODOT officials attended this deposition which concerned a different project. BLM has looked for, but not been able to locate in its files, the map used in that deposition. Plaintiffs also noted that Dr. Connolly, who worked on the Project, cited Mr. Yallup in his research for ODOT and should have knowledge regarding those Native American burial sites.

3. **Bad Faith Exception**

In their first motion, plaintiffs also rely on the bad faith exception to support supplementation of the record.  As evidence of bad faith, they point to the fact that defendants commenced destructive activity before plaintiffs even had a right to seek judicial review.  Tree clearing was nearly complete by March 14, 2008, before plaintiffs received Notice of Final Agency Action which was issued in the Federal Register on April 4, 2008, pursuant to 23 USC § 139(1).

The Federal Defendants respond that the Notice of Final Agency Action does nothing more than allow FHWA to begin the 180-day statute of limitations in which to challenge a final agency action.  In the absence of such a notice, the general statute of limitation in 28 USC § 2401 applies.  They argue that plaintiffs could have sued as early as January 2007, long before the tree clearing began, and certainly after receiving the February 26, 2008 notice that tree clearing was imminent.  The Federal Defendants characterize plaintiffs' delay until after FHWA issued the Notice of Final Agency Action as voluntary.

Plaintiffs disagree, pointing to the third page of the REA which states that claims must be filed within 180 days of the date the REA and FONSI are published in the Federal Register. FHWA AR 4953.  It does not explicitly state that it is a final decision or that 28 USC § 2401 applies if no notice is published in the Federal Register.  Thus, plaintiffs interpret the REA as providing notice that the right to judicial review is unavailable until publication in the Federal Register.  Even if plaintiffs' interpretation is reasonable, the REA correctly states the law and cannot be deemed to have been issued in bad faith.

Plaintiffs also point out that the February 26, 2008 notice was given only days before the tree removal started and did not provide reasonable time to seek and hire counsel and file suit to halt the removal.  Furthermore, Slockish and Jackson received no notice whatsoever.  This belated notice (and lack of notice) is troubling, but must be viewed in the context of the long history preceding the tree removal.  If timely notice was not given (or not given at all to Slockish and Jackson), it is due to the Federal Defendants' view that they had fully complied with all statutory requirements of consultation and notice.  The key dispute in this case is whether that view was legally correct.  Even if the Federal Defendants are proven wrong, their contrary interpretation of the law cannot be deemed an act of bad faith.

Therefore, discovery should not be allowed to supplement the record based on the bad faith exception.

### B. **Constitutional Claims**

As discussed above, the Twelfth and Thirteenth claims survive as to the alleged violations of plaintiffs' constitutional rights arising from interference with their free exercise of religion. Plaintiffs seek discovery as to these claims, arguing that the record is deficient regarding the contemporary religious use of the A.J. Dwyer Scenic Area for Native American plaintiffs and any other Native Americans.

Contending that discovery is appropriate for constitutional claims in APA actions, plaintiffs rely on *Hensala v. Dep't of the Air Force*, 343 F3d 951 (2003).  In that case, the plaintiff filed a claim alleging defendant violated the APA, as well as his due process, equal protection and free speech rights.  The district court allowed limited discovery but then granted summary judgment as to all claims.  On appeal, the Ninth Circuit reversed and remanded for

further proceedings on the equal protection and due process claims, noting genuine issues of fact

needed to be resolved.  However, its decision does not discuss why the trial court ordered

discovery or whether discovery is appropriate in APA cases involving alleged constitutional

violations.

Defendants argue that any constitutional claims must be brought within the confines of an

APA claim and its administrative record and contend that *Hensala* erred in allowing discovery.

*See Harvard Pilgrim Health Care of New England v. Thompson*, 318 F Supp2d 1, 10-11 (D RI

2004) (holding that the presence of constitutional claims in an APA case does not expand review

beyond the existing administrative record); *Charlton Mem. Hosp. v. Sullivan*, 816 F Supp 50, 51

(D Mass 1993) (holding that adding constitutional claims to APA claims "cannot so transform

the case that it ceases to be primarily a case involving judicial review of agency action").

While it is not clear why *Hensala* permitted discovery, this court need not resolve that

issue.  As discussed above, discovery should be allowed regarding the duty to consult with

plaintiffs regarding the importance of the site to them.  The importance of the site is based in part

on its religious importance, which is the basis of the remaining constitutional claims concerning

the free exercise of religion.  In other words, discovery as to the duty to consult will necessarily

involve the same information sought with respect to discovery regarding the constitutional

claims.  Therefore, it is unnecessary to also allow discovery on the remaining constitutional

claims beyond the scope of discovery permissible under the APA.

///

///

///

36 - FINDINGS AND RECOMMENDATIONS

**RECOMMENDATIONS**

1.  The Federal Defendants' Motion for Judgment on the Pleadings (docket #104) should be GRANTED as to the Twelfth Claim (due process violation) based on the rights to travel, freely associate, and maintain and express traditional culture and as to the Fourteenth Claim (violation of the public trust doctrine) and DENIED as to the Twelfth Claim premised on the right to freely exercise religion and the Thirteenth Claim (interference with free exercise of religion);

2.  Garrett's Motion for Judgment on the Pleadings (docket #105) should be GRANTED, and Garrett should be dismissed from this case; and

3.  Plaintiffs' Renewed Motion to Supplement the Record and to Compel Discovery (docket #107) should be GRANTED as to the Third Claim (failure to consult) and otherwise should be DENIED.

**SCHEDULING ORDER**

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due October 11, 2011.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED this 21st day of September, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge