BILLY J. WILLIAMS, Oregon State Bar No. 901366
United States Attorney
**TIM SIMMONS**, Oregon State Bar No.  924615
Assistant U.S.  Attorney
tim.simmons@usdoj.gov
United States Attorney's Office

District of Oregon
405 E.  8th Ave., Suite 2400
Eugene, OR  97401
Telephone:  (541) 465 -6740
Facsimile: (541) 465 -6917

JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
**REUBEN SCHIFMAN**
Trial Attorney
U.S.  Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O.  Box 7611
Washington, D.C.  20044-7611
Telephone: (202) 305-4224
reuben.schifman@usdoj.gov
    Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **HEREDITARY CHIEF WILBUR SLOCKISH, a resident of Washington, and an enrolled member of the Confederated Tribes and Bands of the Yakama Nation,** | **Case No. 3:08-cv-1169** |
| | **Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment** |
| **HEREDITARY CHIEF JOHNNY JACKSON, a resident of Washington, and an enrolled member of the Confederated Tribes and Bands of the Yakama Nation,** | |

**CAROL LOGAN, a resident of Oregon, and an enrolled member of the Confederated Tribes of Grande Ronde,**

**CASCADE GEOGRAPHIC SOCIETY, an Oregon nonprofit corporation,**

    **and**

**MOUNT HOOD SACRED LANDS PRESERVATION ALLIANCE, an unincorporated nonprofit association,**

    **Plaintiffs,**

      **v.**

**UNITED STATES FEDERAL HIGHWAY ADMINISTRATION, an Agency of the Federal Government,**

**UNITED STATES BUREAU OF LAND MANAGEMENT, an Agency of the Federal Government,**

    **and**

**ADVISORY COUNCIL ON HISTORIC PRESERVATION, an Agency of the Federal Government.**

    **Defendants.**

_____

## TABLE OF CONTENTS

I.    Background ................................................................................................ 2

II.   Legal standards ......................................................................................... 3

III.  Argument .................................................................................................. 4

      A.    Plaintiffs' claims not raised during the administrative process are
            waived .............................................................................................. 4

      B.    Plaintiffs' claims are barred by laches ........................................... 7

            1.    Plaintiffs' delay was unreasonable ...................................... 8

            2.    Prejudice from Plaintiffs' delay ......................................... 10

      C.    Plaintiffs' claims raised for the first time in summary judgment are
            waived ............................................................................................ 11

      D.    Plaintiffs can obtain no redress and therefore lack standing ............. 13

            1.    Remand and additional agency process cannot redress
                  Plaintiffs' ultimate injuries ............................................... 14

            2.    Any relief would implicate non-party ODOT ....................... 16

      E.    The project complied with all applicable law .................................... 17

            1.    The project complied with NEPA ........................................ 17

                  a)    No EIS was required ................................................ 18

                  b)    EA considered reasonable alternatives ..................... 19

                  c)    BLM need not duplicate FHWA's environmental
                        review .................................................................... 19

                  d)    No supplemental EA was required ............................ 20

            2.    The project complied with NHPA ....................................... 21

                  a)    Compliance with the programmatic agreement
                        project satisfies NHPA ............................................. 23

                  b)    BLM need not duplicate FHWA and ODOT's
                        NHPA process .......................................................... 25

                  c)    Any technical noncompliance was harmless error ...... 25

            3.    The project complied with FLPMA ..................................... 26

a)    Plaintiffs are barred by the statute of limitations from facially challenging the 1995 Resource Management Plan.........................................................................26

b)    Tree removal was consistent with the Resource Management Plan.........................................................................27

c)    Tree removal was consistent with ORCA...................................29

d)    O&C Tramroads regulation is inapplicable ..............................30

e)    Non-binding Executive Order 13007 is not implicated.................................................................................31

4.    The project complied with the DTA .......................................................32

5.    The project did not implicate NAGPRA.................................................34

a)    NAGPRA's regulations bar Plaintiffs' claims...........................35

b)    The rock cluster was discovered before NAGPRA's enactment and thus the law does not apply to it ........................36

c)    Neither human remains nor associated funerary objects were inadvertently discovered .........................................36

6.    The project does not violate the free exercise clause.............................38

IV.    Conclusion .......................................................................................................40

# TABLE OF AUTHORITIES

## Cases

*Apache Survival Coal. v. United States*,
    21 F.3d 895 (9th Cir. 1994) ................................................................ 8, 9, 10, 22, 23

*ASARCO, Inc. v. Kadish*,
    490 U.S. 605 (1989)......................................................................................... 16

*Bark v. U.S. Bureau of Land Mgmt.*,
    643 F. Supp. 2d 1214 (D. Or. 2009) .................................................................. 4

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
    No. CV 12-9861-GW(SSX), 2016 WL 4445770 n.1 (C.D. Cal. Aug. 12, 2016).............. 32, 33

*Bonnichsen v. United States*,
    367 F.3d 864 (9th Cir. 2004) ....................................................................... 34, 35

*Boyd v. Etchebehere*,
    No. 17-16750, 2018 WL 3569027 (9th Cir. July 25, 2018) ................................... 38

*Brass v. Cty. of Los Angeles*,
    328 F.3d 1192 (9th Cir. 2003) ........................................................................ 12

*Cal. Coastal Comm'n v. U.S. Dep't of the Navy*,
    22 F. Supp. 3d 1081 (S.D. Cal. 2014)................................................................ 11

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ........................................................................ 26

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ......................................................................... 19

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    *(Lukumi)*, 508 U.S. 520 (1993) .............................................................. 38, 39, 40

*Citizens & Landowners Against the Miles City/New Underwood Powerline v. Sec'y, U.S. Dep't of Energy*,
    513 F. Supp. 257 (D.S.D. 1981) ...................................................................... 10

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997) .......................................................................... 5

*City of Rochester v. U.S. Postal Serv.*,
    541 F.2d 967 (2d Cir. 1976) ........................................................................... 10

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ........................................................................ 26

*Cmtys. Against Runway Expansion, Inc. v. FAA*,
    355 F.3d 678 (D.C. Cir. 2004)........................................................................ 31

*Coalition of Concerned Citizens To Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of*

*Transp.*,
843 F.3d (10th Cir. 2016) ........................................................................... 22

*Costello v. United States*,
365 U.S. 265 (1961) ........................................................................... 8, 10, 37

*Coyote Valley Band of Pomo Indians of Cal. v. U.S. Dep't of Transp.*,
No. 15-CV-04987-JSW, 2018 WL 1587212 (N.D. Cal. Apr. 2, 2018) ................................... 24

*Ctr. for Biological Diversity v. Cal. Dep't of Transp.*, No. C,
12-02172 JSW, 2012 WL 5383290 (N.D. Cal. Nov. 1, 2012) ............................................. 11

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) ........................................................................... 15

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ........................................................................... 4

*Fernandez v. Mukasey*,
520 F.3d 965 (9th Cir. 2008) ........................................................................... 38

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
62 F. Supp. 3d 1 (D.D.C. 2015) ........................................................................... 15

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ........................................................................... 4

*Fleming v. Lind-Waldock & Co.*,
922 F.2d 20 (1st Cir. 1990) ........................................................................... 21

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*,
887 F.3d 906 (9th Cir. 2018) ........................................................................... 13, 16

*Friends of the Earth, Inc. v. Bergland*,
576 F.2d (9th Cir. 1983) ........................................................................... 15

*Friends of Yosemite v. Frizzell*,
420 F. Supp. 390 (N.D. Cal. 1976) ........................................................................... 10

*Gardner v. BLM*,
638 F.3d 1217 (9th Cir. 2011) ........................................................................... 29

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
465 F.3d 1123 (9th Cir. 2006) ........................................................................... 16

*Hall v. U.S. EPA*,
273 F.3d 1146 (9th Cir. 2001) ........................................................................... 26

*Havasupai Tribe v. Robertson*,
943 F.2d 32 (9th Cir. 1991) ........................................................................... 5, 6, 27

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
593 F.3d 923 (9th Cir. 2010) ........................................................................... 29, 30

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
  545 F.3d 1147 (9th Cir. 2008) ........................................................................ 19

*Iowa Student Pub. Interest Research Grp. v. Callaway*,
  379 F. Supp. 714 (S.D. Iowa 1974) ................................................................. 9

*Jones v. Williams*,
  791 F.3d 1023 (9th Cir. 2015) ........................................................................ 38

*Kandra v. United States*,
  145 F. Supp. 2d 1192 (D. Or. 2001) ............................................................... 15

*Karuk Tribe v. Kelley*,
  No. C 10-02039 WHA, 2011 WL 2444668 (N.D. Cal. June 13, 2011) ................... 21

*Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of BLM*,
  400 F. Supp. 2d 1234 (D. Or. 2005) ............................................................... 26

*Knaust v. Kingston*,
  157 F.3d 86 (2d Cir. 1998) ............................................................................ 15

*Kolek v. Engen*,
  869 F.2d 1281 (9th Cir. 1989) ....................................................................... 26

*La Cuna De Aztlan Sacred Sites Protection Circle Advisory Comm. v. Western Area Power Admin.*,
  No. EDCV 12-00005 VAP, 2012 WL 6743790 (C.D. Cal. Nov. 29, 2012) ................ 7

*LaFlamme v. FERC*,
  945 F.2d 1124 (9th Cir. 1991) ....................................................................... 20

*Lathan v. Volpe*,
  455 F.2d (9th Cir. 1971) ................................................................................. 9

*Laub v. U.S. Dep't of Interior*,
  342 F.3d 1080 (9th Cir. 2003) ....................................................................... 14

*Lindberg v. U.S. Forest Serv.*,
  132 F. Supp. 3d 1255 (D. Or. 2015) ............................................................... 18

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 14

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................................... 21

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  138 S.Ct. 1719 (2018) ................................................................................... 39

*Nat'l Parks & Conservation Ass'n v. BLM*,
  606 F.3d 1058 (9th Cir. 2010) ......................................................................... 5

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  184 F. Supp. 3d 861 (D. Or. 2016) ................................................................... 3

*National Parks & Conservation Ass'n v. Hodel*,
   679 F. Supp. 49 (D.D.C. 1987) ........................................................................ 11

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ........................................................................ 19

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) .......................................................................... 8

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) ............................................................................ 4

*Occidental Eng'g Co. v. INS*,
   753 F.2d 766 (9th Cir. 1985) ............................................................................ 4

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) ...................................................................... 8, 10

*Or. Nat. Res. Council, Inc. v. Wood*,
   52 F.3d 334 (9th Cir. 1995) ............................................................................ 15

*Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) .................................................................... 4, 18

*Portland Cement Ass'n v. Ruckelshaus*,
   486 F.2d 375 (D.C. Cir. 1973) ........................................................................ 40

*Pres. Coal., Inc. v. Pierce*,
   667 F.2d 851 (9th Cir. 1982) ............................................................................ 8

*Presidio Golf Club v. Nat'l Park Serv.*,
   155 F.3d 1153 (9th Cir. 1998) ........................................................................ 18

*Price Rd. Neighborhood Ass'n v. U.S. Dep't of Transp.*,
   113 F.3d 1505 (9th Cir. 1997) ........................................................................ 20

*Rattlesnake Coal. v. EPA*,
   509 F.3d 1095 (9th Cir. 2007) .................................................................. 13, 15

*Salmon Spawning & Recovery All. v. Gutierrez*,
   545 F.3d 1220 (9th Cir. 2008) .................................................................. 14, 15

*San Jose Christian Coll. v. City of Morgan Hill*,
   360 F.3d 1024 (9th Cir. 2004) ........................................................................ 40

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................................ 3

*Save the Peaks Coal. v. U.S. Forest Serv.*,
   669 F.3d 1025 (9th Cir. 2012) .................................................................. 7, 8, 9

*Shasta Res. Council v. U.S. Dep't of Interior*,
   629 F. Supp. 2d 1045 (E.D. Cal. 2009) ...................................................... 27, 28

*Shinseki v. Sanders*,
　556 U.S. 396 (2009)..................................................................................... 26

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
　433 F.3d 772 (10th Cir. 2006) ..................................................................... 18

*South Fork Band v. U.S. Dep't of Interior*,
　No. 3:08-CV-00616, 2010 WL 3419181 (D. Nev. Aug. 25, 2010)......................... 32

*Spokeo, Inc. v. Robins*,
　136 U.S. 1540 (2016)..................................................................................... 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
　239 F. Supp. 3d 77 (D.D.C. 2017)................................................................ 9, 11, 40

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998)......................................................................................... 14

*Stidhem v. Schwartz*,
　No. 2:15-CV-00379-TC, 2017 WL 6887139 (D. Or. Oct. 23, 2017) ...................... 38

*Stow v. United States*,
　696 F. Supp. 857 (W.D.N.Y. 1988) ................................................................... 9

*Swanson v. U.S. Forest Serv.*,
　87 F.3d 339 (9th Cir. 1996) ........................................................................... 21

*Town of Chester v. Laroe Estates, Inc.*,
　137 S. Ct. 1645 (2017)................................................................................... 15

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
　671 F.3d 1113 (9th Cir. 2012) ....................................................................... 20

*United States v. L.A. Tucker Truck Lines*,
　344 U.S. 33 (1952)...................................................................................... 4, 27

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
　435 U.S. 519 (1978)................................................................................... 4, 5, 6

*W. Watersheds Project v. BLM*,
　971 F. Supp. 2d 957 (E.D. Cal. 2013) ............................................................. 26

*Wasco Prods., Inc. v. Southwall Technologies, Inc.*,
　435 F.3d 989 (9th Cir. 2006) ......................................................................... 12

*WildEarth Guardians v. U.S. Dept. of Agriculture*,
　795 F.3d (9th Cir. 2015) ............................................................................. 14

*Williams v. Rodriguez*,
　No. C 10-2715 RMW PR, 2012 WL 1194160 (N.D. Cal. Apr. 10, 2012) ............. 13

*Wis. v. Weinberger*,
　745 F.2d 412 (7th Cir. 1984) ......................................................................... 21

**Statutes**

16 U.S.C. § 470(f)......................................................................................................22

16 U.S.C. § 470(w)(7)...............................................................................................25

23 U.S.C. § 138(a)......................................................................................................33

23 U.S.C. § 317..........................................................................................................30

25 U.S.C. § 3002(d)....................................................................................................36

25 U.S.C. §§ 3001-3013..............................................................................................34

28 U.S.C. § 2401(a)....................................................................................................27

42 U.S.C. § 2000bb-1.................................................................................................15

42 U.S.C. § 4332(2)(C)..............................................................................................17

43 U.S.C. § 1701........................................................................................................13

43 U.S.C. § 1712(a)....................................................................................................26

43 U.S.C. § 1732(b)....................................................................................................29

49 U.S.C. § 303(c)......................................................................................................33

5 U.S.C. § 706............................................................................................................25

5 U.S.C. § 706(2)........................................................................................................15

Pub. L. No. 104-208...................................................................................................29

Pub. L. No. 104-208 § 401(h).....................................................................................29

Pub. L. No. 113-287...................................................................................................22

**Regulations**

23 C.F.R. Part 774.....................................................................................................33

36 C.F.R. § 800..........................................................................................................24

36 C.F.R. § 800.14(b).................................................................................................23

36 C.F.R. § 800.6(c)(2)(ii)..........................................................................................23

36 C.F.R. § 800.6(c)(2)(iv).........................................................................................23

36 C.F.R. § 800.6(c)(3)...............................................................................................23

36 C.F.R. § 800.8(a)...................................................................................................22

40 C.F.R. § 1500.2(c).................................................................................................22

40 C.F.R. § 1501.3(b).................................................................................................17

40 C.F.R. § 1501.4(b).................................................................................................17

40 C.F.R. § 1501.5 .................................................................................................... 19

40 C.F.R. § 1501.6(b)(4) ......................................................................................... 20

40 C.F.R. § 1508.9(a)(1) .......................................................................................... 17

43 C.F.R. § 10.2(a)(5) .............................................................................................. 36

43 C.F.R. § 10.2(b) ................................................................................................... 35

43 C.F.R. § 10.2(d)(2) .............................................................................................. 37

43 C.F.R. § 10.2(d)(3) .............................................................................................. 37

43 C.F.R. § 10.2(d)(4) .............................................................................................. 37

43 C.F.R. § 10.2(g)(4) .............................................................................................. 36

43 C.F.R. § 10.4(b) ................................................................................................... 36

43 C.F.R. § 2812.0-5(f) ............................................................................................ 30

43 C.F.R. § 2812.5-1 ................................................................................................ 30

61 Fed. Reg. 26,771 (May 24, 1996) ........................................................ 12, 13, 31, 32

**Other Authorities**

BLM, *Salem District Resource Management Plan,*
    https://www.blm.gov/or/plans/files/salem_rmp.pdf. .............................................. 26

FHWA, *Section 4(f) Policy Paper,*
    https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx. ......................... 33

**ACRONYMS**

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APA | Administrative Procedure Act |
| CGS | Cascade Geographic Society |
| BLM | Bureau of Land Management |
| DTA | Department of Transportation Act |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| FLPMA | Federal Land Policy and Management Act |
| FONSI | Finding of No Significant Impact |
| NAGPRA | Native American Graves and Protection Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| ODOT | Oregon Department of Transportation |
| ONRCA | Oregon Natural Resources Conservation Act |
| O&C Lands | Oregon and California Railroad Revested Lands |
| RMP | Resource Management Plan |
| REA | Revised Environmental Assessment |
| RFRA | Religious Freedom Restoration Act |
| SHPO | State Historic Preservation Officer |

**TIMELINE**

| Date | Description | Administrative Record Citation |
|---|---|---|
| 12/14/1998 | Citizens petition ODOT to build safe turn lane | FHWA-004440 |
| 1/13/2000 | Scoping Meeting - Wildwood to Wemme project | FHWA-001977 |
| 11/12/2003 | Mt. Hood Hwy. Safety Corridor Field Hearing | FHWA-002031, FHWA-002037 |
| 3/8/2005 | Wildwood Wemme Listening Session | FHWA-002138 |
| 3/31/2005 | Public meeting - Wildwood Wemme project | FHWA-004791-4800 |
| 9/7/2005 | Meeting with Tribal elders, providing project map | FHWA-005674 |
| 9/13/2005 | Public meeting - Wildwood-Wemme project alternatives | FHWA-004801-4902 |
| 1/30/2006 | Email consultation with Grand Ronde, Siletz, Warm Springs Tribes | FHWA-005674 |
| 2/23/2006 | Public Meeting - Wildwood-Wemme project | FHWA-004903-004922 |
| 4/2006 | Section 106 report, SHPO concurrence, concluding NHPA process | FHWA-003332-62 |
| 8/2006 | Draft Environmental Assessment released to public | FHWA-004343 |
| 9/21/2006 | Open House and Public Hearing | FHWA-004923-4945 |
| 1/25/2008 | Revised Environmental assessment and Finding of No Significant Impact Signed | FHWA-004951 |
| 2/15/2008 | Plaintiffs request additional NHPA review | FHWA-005559 |
| 2/26/2008 | FHWA responds to Plaintiffs' NHPA request | FHWA-005943 |
| 3/10/2008 | Consultation with Yakama | FHWA-007495 |
| 10/06/2008 | Plaintiffs file suit | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS
MOTION FOR SUMMARY JUDGMENT**

In 1998 hundreds of citizens petitioned the Oregon Department of Transportation
(ODOT) to build a turn lane on a dangerous stretch of highway that, unlike the road immediately
before and after it, lacked this crucial safety feature.  Over the course of several years, ODOT
worked with the Federal Highway Administration (FHWA), Bureau of Land Management
(BLM),[1] State Historic Preservation Officer (SHPO), Tribal governments, local organizations,
concerned citizens, and many others to study the environmental and historical effects of adding
this turn lane.

In an administrative process lasting years, hundreds of citizens engaged with ODOT and
its federal partners, attending town halls, submitting written comments, and reviewing drafts of
the proposed highway expansion plans. In these years of public participation and process, the
Plaintiffs made a single comment.  Plaintiff Jones, director of Plaintiff Cascade Geographic
Society (CGS) expressed concern about decorative stone pillars, which mark the entrance of a
residential subdivision called Mountain Air.  ODOT studied the pillars and concluded they were
not eligible for listing on National Register of Historic Places, and moved them so they would
not be affected by the construction of the turn lane.

In stark contrast, at the time the Finding of No Significant Impact (FONSI) and
documentation of Section 106 compliance, (concluding environmental and historical review for
the project), no Plaintiff had made any comment about any other concern.  During the years-long
administrative process, Plaintiffs gave no indication that a rock cluster immediately next to the
existing highway had religious significance to them.  Plaintiffs did not propose a steeper slope to
protect the rock cluster and unofficial campground.  Nor did Plaintiffs raise any legal concern
related to the tree-cutting permit.  Nor did Plaintiffs propose additional environmental or

---

[1] FHWA, BLM, and the Advisory Council on History Preservation (ACHP) are collectively
referred to as Federal Defendants herein.

historical review.  Plaintiffs simply *made no comment whatsoever* to bring the concerns they raise in this suit to the attention of the relevant decision-makers within the relevant time period.

It is black-letter administrative law that Plaintiffs waived their claims by failing to raise them during the administrative process.  Similarly, the doctrine of laches counsels against granting injunctive relief to plaintiffs who have slept on their rights as these Plaintiffs have. And, incredibly, many of Plaintiffs' arguments appear for the first time in their Motion for Summary Judgment—never once mentioned in Plaintiffs' four Complaints amended over the course of a decade. These claims are waived as well.

Even if the arguments Plaintiffs raise were not waived, the relief they seek is outside of the relief available under the Administrative Procedure Act (APA) which only allows this Court to "set aside" the relevant federal actions to allow the agencies to engage in additional procedure. Such procedural relief under the APA cannot redress Plaintiffs' alleged injuries—the loss of the rock cluster, trees, and campground, which have been gone for a decade.  But even if it were possible under the APA to order Federal Defendants to dig up the highway it is actually ODOT—who has already been dismissed from this suit—who owns the highway.  Thus, there is no relief possible against the Federal Defendants and Plaintiffs have no standing which in turn requires dismissal of their claims.

Plaintiffs are free to visit the federal land at issue here, and in common with all the public, to recreate, engage in religious exercise, or in any other way enjoy the area.  But they cannot insist, under the legal theories of this case, that the area be restored to its state before the turn lane was added in 2008.

## I.    BACKGROUND

The Court is familiar with the facts of this case, having already considered and ruled on a first round of summary judgment briefing.  *See* ECF Nos. 301, 312. As a result, only a brief synopsis follows and the Federal Defendants incorporate by reference the facts and background discussed in the prior ruling and the Federal Defendants' briefs. *Id.*; ECF No. 287.

Plaintiffs' challenges stem from Federal Defendants' participation in an ODOT project to construct a turn lane on Highway U.S. 26, between the communities of Wildwood and Wemme. *Id.* Before the turn lane's construction, there was no "refuge" lane in the middle of the roadway for motorists to use while waiting to execute left turns across the oncoming lanes of traffic to the businesses and homes along the opposite side of the highway. Thus, people turning along this stretch of highway were more susceptible to severe rear-end collisions with other vehicles in the travel lanes, some resulting in fatal accidents. FHWA-004973; FHWA-002135.

In 1998, ODOT received a petition signed by 674 Oregon residents raising these safety concerns.  FHWA-004440. ODOT added a highway widening project to the State's list of highway projects to be constructed in the following years and then engaged in a robust public outreach and comment campaign involving public meetings, newsletters, and "open houses."  As discussed in more detail below, Plaintiffs did not participate in this process nor express the concerns they raise in this lawsuit before the conclusion of environmental historical review for the project.

## II.    LEGAL STANDARDS

Plaintiffs' claims are reviewed under the standards of the Administrative Procedure Act (APA).  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).  The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (quotation marks and citation omitted); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 879 (D. Or. 2016).

If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course "is to remand to the agency

for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

In evaluating a Rule 56 motion for summary judgment under the APA, the Court neither sits as an evidentiary fact-finder nor resolves allegedly disputed facts. Rather, the Court sits as an appellate tribunal and determines, as a matter of law, whether the facts found by the agency and the agency's decision as a whole are supported by the administrative record. *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994).

## III.   ARGUMENT

### A.   Plaintiffs' claims not raised during the administrative process are waived

The Supreme Court and Ninth Circuit have long held that a plaintiff must participate in an agency's administrative decision-making process in order to later advance a claim in federal court. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553–54 (1978); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081 (9th Cir. 2011) ("A party waives arguments that are not raised during the administrative process."); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764-65 (2004); *Bark v. U.S. Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1229 (D. Or. 2009). This long-standing rule is based on "[s]imple fairness to those who are engaged in the tasks of administration, and to litigants," and "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 37 (1952).

In the seminal case on this issue the Supreme Court cautioned that it is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vt. Yankee*, 435 U.S. at 553. Allowing a plaintiff to disregard the administrative process but then succeed in litigation, the

Supreme Court cautioned, could incentivize "making cryptic and obscure reference" and then faulting an agency for not addressing them—undermining the goals of the administrative process. *Id.* at 553-54.

Following this reasoning, courts in this circuit have repeatedly reaffirmed that they will consider only those issues that were "presented before an administrative proceeding *at the appropriate time.*" *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010) (quoting *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986) (emphasis added)); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991) (per curiam) ("[B]elatedly raised issues may not form a basis for reversal of an agency decision." (citing *Vt. Yankee*, 435 U.S. at 553-54)).

Because Plaintiffs never raised the claims they articulate in this lawsuit during the administrative process, those claims are waived.  During the years-long administrative process, hundreds of members of the public participated in town halls, signed petitions, provided detailed written and oral comments, reviewed the draft Environmental Assessment (EA), and generally made their concerns known to the Federal Defendants.  In response to public comments, the project was modified.  This process epitomizes "[t]he very purpose of a draft and the ensuing comment period . . . ." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1156 (9th Cir. 1997).  The public administrative process is discussed in depth in Federal Defendants' prior motion for summary judgment and that discussion is incorporated by reference herein. ECF No. 287 at 2-8. Significant dates are summarized in Table 1 at the start of this brief.

It is undisputed that from the first public meeting to the publication of the FONSI Plaintiffs never made their concerns known.  Throughout this time, Plaintiffs were aware of the project and the public process.  *See, e.g.*, FHWA-002153 (information regarding project sent to Plaintiff Jones); 005006. Indeed, the record reflects that the Federal Defendants made sincere efforts not only to involve the public at large, but *to specifically reach out to the Plaintiffs to seek their input*. *See* BLM-000063 (noting that Jones, director of Plaintiff CGS had "not availed himself of the public process that has been created for the project and made available to the

public for project involvement.  The project staff has provided many opportunities for public involvement *and made extra efforts to involve Mr. Jones*. He has not yet participated in any of the public meetings." (emphasis added)).

Mr. Jones did ultimately provide a single comment, which is summarized in the EA. FHWA-004977. This represents the only input the Federal Defendants ever received from him or any other Plaintiff during the years-long administrative process.  In this comment, Mr. Jones discussed stone pillars that mark the entrance to a residential subdivision. He never mentioned even in general terms any other concerns, including the concerns now raised in this suit. As part of the project, the pillars were studied and relocated. FHWA-000989, 6067.

But as of April 2006 when ODOT documented its Section 106 compliance, and as of January 2007, when a FHWA official signed the FONSI, concluding the process under NEPA and the NHPA, Plaintiffs had not otherwise participated in the administrative process.

The facts here thus parallel *Vermont Yankee*.  There, the Court noted that during the administrative process, the agency "continually invited further clarification of [Plaintiff's] contentions . . . . But not only did [Plaintiff] decline to further focus its contentions, it virtually declined to participate." *Vt. Yankee*, 435 U.S. at 554. So too here.

Following the conclusion of the administrative processes under NEPA and NHPA, Plaintiffs did "belatedly" begin to contact the Federal Defendants.  *See Havasupai Tribe*, 943 F.2d at 34. But even these communications did not fully raise the claims Plaintiffs seek to articulate here.

The most detailed communication from Mr. Jones is a document sent in March 2008 titled "New Section 106 Process for the 'Wildwood to Wemme Project.'"  ACHP-00047-49. The email begins by "requesting that a complete and accurate Section 106 process of the National Historic Preservation Act needs to take place on the 'Wildwood to Wemme Project'. . . to insure that all heritage resources, whether they be historical, cultural, or natural, be protected." *Id*.  The email has a single reference to "religious sites" which it mentions as one of a list of sites that allegedly "constitute a district for the NHPA" that the authors ask FHWA to identify as "related"

to approximately thirty other "other indigenous cultural and religious areas on Mount Hood." ACHP-00049.

Plaintiff Logan also sent a series of faxes in February 2008, after the environmental review for the project was completed. *Id.* The faxes make reference to "stones that made up a monument associated with American Indian graves [that] had been carried off" and asks "what can be done to insure their protection?" *Id.* The faxes do not mention any religious significance associated with these stones, nor do they identify specifically where they are (other than generally within the project area). Nor do the faxes propose any alternative or any other action to protect the stones.

Making comments after the environmental review was already complete and the FONSI was signed is insufficient to revive claims that Plaintiffs waived. A directly analogous case is *La Cuna De Aztlan Sacred Sites Protection Circle Advisory Comm. v. Western Area Power Admin.*, No. EDCV 12-00005 VAP, 2012 WL 6743790 (C.D. Cal. Nov. 29, 2012).

As here, the *La Cuna* plaintiffs raised concerns after the relevant agency issued the final environmental review document, in that case an Environmental Impact Statement (EIS). The Court reasoned that plaintiffs "cite to a letter dated August 2011. Defendants issued their final EIS in June 2011; thus, Plaintiffs failed to alert Defendants to their objections while Defendants were still able to address the issue. Accordingly, Plaintiffs' specific objections. . . have been waived." *Id.* at *9.

As a result, all the claims that Plaintiffs could have raised as part of the administrative process under NEPA, NHPA, FLPMA, NAGPRA, and the DTA are waived. Their concerns could have been addressed, but they chose not to speak a word to the relevant agency officials. It would be inappropriate to now fault the agency for not addressing these concerns.

### B.    Plaintiffs' claims are barred by laches

"Laches is an equitable defense," derived from the principle that "a party who sleeps on his rights loses his rights." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1031 (9th Cir. 2012) (citations omitted). For laches to apply, the moving party must show: "(1) lack of

diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282 (1961); *Save the Peaks Coal.*, 669 F.3d at 1031 (citing *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998)); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 862 (9th Cir. 2005). Although the Ninth Circuit has explained that the equitable doctrine of "'[l]aches must be invoked sparingly' in suits brought to vindicate the public interest," *Apache Survival Coal. v. United States*, 21 F.3d 895, 905 (9th Cir. 1994) (quoting *Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982)), it has nonetheless enforced laches defenses in cases where there is a clear lack of diligence on the part of the plaintiff and undue prejudice to the defendant. *See, e.g., id.* at 910-12. Here, the record clearly establishes both.

### 1.   Plaintiffs' delay was unreasonable.

In determining whether a party's delay was unreasonable the court may consider a number of factors including (1) whether, and in what manner, the party communicated its position to the agency before filing suit; (2) the agency's response; (3) the nature of the agency's action, such as preparatory construction, in pursuing the project; (4) the length of plaintiff's delay; and (5) the circumstances surrounding the delay. *Save the Peaks Coal.*, 669 F.3d at 1031; *Ocean Advocates*, 402 F.3d at 862; *Pres. Coal.*, 667 F.2d at 854. As a laches determination must be reached on a case-by-case basis, these factors will not "always be neatly applied to the facts of a particular case." *Save the Peaks Coal.*, 669 F.3d at 1031 (citing *Pres. Coal.*, 667 F.2d at 854).

The application of the relevant factors demonstrates that Plaintiffs lacked diligence in pursuing their claims. For more than three years prior to construction, FHWA, BLM, the public, tribal governments, the State of Oregon, local governments, and other federal agencies worked their way through the administrative process for the turn-lane project. The agencies held town hall meetings, produced a draft environmental assessment, held further public meetings, took in person and written public comment, issued a revised environmental assessment and finally signed a FONSI.

During all that time, Plaintiffs never told Federal Defendants or ODOT that they believed that the turn lane would harm their religious practice, or that they had any concern whatsoever about it.  Only after the FONSI was signed, years after the administrative process began, and construction had started did Plaintiffs belatedly send several letters.  Plaintiffs did not seek a preliminary injunction to halt construction, and did not even serve Federal Defendants until February 2009.

The facts in this case are similar to those in *Apache Survival Coalition v. United States*. In that case, a tribe chose not participate in the long administrative NEPA and NHPA process and then sued, alleging that the construction of an observatory would harm the tribe's sacred sites.  21 F.3d at 898–900.  The Ninth Circuit found that the tribe "ignored the *very process* that its members now contend was inadequate" and that as a result, it had asserted its rights "with inexcusable tardiness," and its claims were barred by laches.  *Id*. at 907–10; *see also Stow v. United States*, 696 F. Supp. 857, 862-63 (W.D.N.Y. 1988).

The facts are also similar to *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 239 F. Supp. 3d 77 (D.D.C.), *appeal dismissed*, No. 17-5043, 2017 WL 4071136 (D.C. Cir. May 15, 2017).  In *Standing Rock*, despite being aware of the proposed Dakota Access Pipeline for years, the plaintiff "remained silent" as to its specific concern, which was the impact the project may have on its religious exercise.  The Court found the plaintiff had "inexcusably delayed" raising its "specific religious-exercise concerns" and the injunctive relief plaintiff sought was barred by laches.  *Id*. at 86-87.  *See also Lathan*, 455 F.2d at 1122; *Iowa Student Pub. Interest Research Grp. v. Callaway*, 379 F. Supp. 714, 719-21 (S.D. Iowa 1974).

Plaintiffs claim that the fact that they communicated with ODOT years earlier, and then belatedly share some of their concerns, is sufficient to prevent waiver.  Under Ninth Circuit precedent, it is not.  For example, in *Save the Peaks*, the Ninth Circuit found that the plaintiffs lacked diligence in pursuing their claims even though "some of them made comments about the DEIS and participated in the administrative appeal process." 669 F.3d at 1031.  Here, Plaintiffs did not even take those steps, and therefore failed to diligently pursue their claims.  *See*

*also Apache Survival Coal.*, 21 F.3d at 909-10; *City of Rochester v. U.S. Postal Serv.*, 541 F.2d 967, 977 (2d Cir. 1976); *Citizens & Landowners Against the Miles City/New Underwood Powerline v. Sec'y, U.S. Dep't of Energy*, 513 F. Supp. 257, 264 (D.S.D. 1981), *aff'd*, 683 F.2d 1171 (8th Cir. 1982); *cf. Ocean Advocates*, 402 F.3d at 863.

### 2.    Prejudice from Plaintiffs' delay

The second element of laches is prejudice to the party seeking laches. *Costello*, 365 U.S. at 282. "The primary concern" when evaluating prejudice "is whether the harm that Congress sought to prevent through the relevant statutory scheme is now irreversible, or is reversible only at undue cost to the relevant project." *Apache Survival Coal.*, 21 F.3d at 912 (citations omitted). Where, as in this case, "the costs of altering or abandoning the project could so definitely outweigh whatever benefits that might accrue" from the suit, the prejudice balance must tip in the favor of the party seeking laches and away from the party that "slept on their rights." *Friends of Yosemite v. Frizzell*, 420 F. Supp. 390, 398 (N.D. Cal. 1976) (citations omitted).

The prejudice suffered by Federal Defendants in this action due to Plaintiffs' unreasonable delay in bringing this action far outweighs the potential benefit of supplemental environmental review or other relief requested by Plaintiffs. Here, there is very little potential benefit of, for instance, a new environmental assessment under NEPA or additional consultation under the NHPA, because the turn lane has been constructed for more than a decade and additional environmental review would be futile.

In contrast, Federal Defendants have suffered substantial prejudice from Plaintiffs' unreasonable delay because, without being made aware of a specific objection to the project until after the administrative process concluded, the Federal Defendants could not meaningfully engage with the Plaintiffs to understand and potentially address their concerns.  Now that the project has been completed, significant prejudice would ensue if the Federal Defendants were enjoined to remove or alter the highway, or even conduct additional environmental review to address concerns they were not timely informed of.  Courts have found prejudice under similar circumstances.

For instance, in *National Parks & Conservation Ass'n v. Hodel*, the D.C. Circuit found that:

> [g]ranting the relief sought by plaintiffs in this case would clearly prejudice defendants. Capital expenditures of almost three million dollars have been made for the [project]. A number of actions have been taken by defendants which plaintiffs might have been successful at preventing before the fact had plaintiffs brought this suit in a timely manner.

679 F. Supp. 49, 54 (D.D.C. 1987); *cf. Cal. Coastal Comm'n v. U.S. Dep't of the Navy*, 22 F. Supp. 3d 1081, 1096 (S.D. Cal. 2014) (no prejudice where "construction has yet to occur on the site, and no identifiable funds have yet to be spent on construction"); *Ctr. for Biological Diversity v. Cal. Dep't of Transp.*, No. C 12-02172 JSW, 2012 WL 5383290, at *7 (N.D. Cal. Nov. 1, 2012) (same).

Similarly, in *Standing Rock*, even though the project at issue had not yet been completed, the court found prejudice in the context of laches, noting that "[s]uspending the effect of the easement now would undercut the purpose behind the consultation obligations built into the [defendants'] permitting processes, which aim to surface tribal concerns in a timely manner. Such injunctive relief would also, by delaying the flow of oil, impose significant costs on a private third party . . . ." 239 F. Supp. 3d at 87. So too here. Federal Defendants would be prejudiced because the consulting and environmental review process would be "undercut" and the non-party, ODOT, could face substantial costs if the Federal Defendants sought to alter the highway or engage in a renewed environmental review process.

### C.   Plaintiffs' claims raised for the first time in summary judgment are waived

Plaintiffs have amended their complaint four times over nearly a decade. They have added claims then dropped them or had them dismissed, changed factual allegations, and generally not been shy about updating their contentions. ECF Nos. 1, 3, 157, 223. Yet some of

the claims Plaintiffs raise here are not present in their operative amended complaint or any of the four that came before. For this reason they are waived.

A claim raised for the first time in summary judgment is waived. *See Wasco Prods., Inc. v. Southwall Technologies, Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory . . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990))); *see also Brass v. Cty. of Los Angeles*, 328 F.3d 1192, 1197-98 (9th Cir. 2003).

First, the arguments appearing in Plaintiffs' motion at pages 24-25 ("Failure to prepare EIS") and 28-30 ("Failure to prepare supplemental NEPA document") are waived. The Complaint's only NEPA claim is Plaintiffs' sixth claim for relief which states "[b]ecause Defendant FHWA violated the NHPA, as detailed in the First through Fifth Claims for Relief, ¶¶ 1-72, they also violated NEPA."  ECF No. 223 ¶ 74.  Plaintiffs do not allege in their complaint that an Environmental Impact Statement (rather than an EA) was required on this basis, and they do not allege that a Supplemental EA was required.  They mention no complaint whatsoever with the NEPA process other than that as it relates to an alleged violation of NHPA.  Nor does Plaintiffs' prayer for relief include the creation of an EIS or Supplemental EA.

Second, Plaintiffs' arguments at pages 41-45 regarding the Oregon Resources Conservation Act ("ORCA"), O&C Lands Tramroads regulation, and Executive Order 13007, (which Plaintiffs characterize as claims under FLPMA), are waived. Plaintiffs' complaint contains a single mention of FLPMA, which states "[i]n addition, the tree removal undertaken by Defendant FHWA on land owned by Defendant BLM was in contravention to the tree cover and protection provisions for the A.J. Dwyer Scenic Area in Defendant BLM's Salem District

Resource Management Plan. The tree removal violated the Federal Land Policy Management Act, 43 U.S.C. § 1701 et. seq."  ECF No. 223 ¶ 75. There is *no mention whatsoever* of ORCA, the O&C Lands Act or its regulations, or Executive Order 13007 in the context of a FLPMA violation or anywhere else in Plaintiffs' Complaint.

Third, Plaintiffs' arguments at pages 45-46 which present a facial challenge to BLM's 1995 Resource Management Plan ("1995 RMP") are waived.  Plaintiffs' complaint alleges that the tree cutting permit issued by BLM violated FLPMA because it allegedly contravened tree cover and protection provisions."  ECF No. 223 ¶ 75. Nowhere does the Complaint allege that the 1995 RMP itself violated any law or specify that it had failed to be adopted following certain "information-gathering procedures." ECF No. 331 at 45.  Nor does Plaintiffs' complaint seek any relief related to the 1995 RMP.

The time for Plaintiffs to advance their claims was when they filed their complaint in 2008 or perhaps any of their amended complaints—not when they move for summary judgment in 2019.  The claims identified above are waived and Plaintiffs should not be allowed to amend their complaint yet again at this late stage.  *See Williams v. Rodriguez*, No. C 10-2715 RMW PR, 2012 WL 1194160, at *9 (N.D. Cal. Apr. 10, 2012), *aff'd sub nom. Williams v. Mumtaz*, 532 F. App'x 679 (9th Cir. 2013).

### D.    Plaintiffs can obtain no redress and therefore lack standing

This Circuit has recently reiterated that redressability, and thus standing, are lacking "where an agency's correction of a procedural error could not lead to a decision more favorable to plaintiffs, *as where a project had already been completed*."  *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 917–19 (9th Cir. 2018) (emphasis added) (citing *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1102–03 (9th Cir. 2007)).

Now that the turn lane has been constructed for more than a decade, additional environmental review or other agency process—the only relief available under the APA—cannot

redress Plaintiffs' injuries.  As a result, Plaintiffs cannot obtain redress and therefore lack standing.

A plaintiff must establish the three elements that constitute the "irreducible constitutional minimum" of Article III standing, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), including that plaintiffs' injury "is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61).

 "The redress[a]bility requirement is not toothless in procedural injury cases." *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008).  To establish redressability in this context, the plaintiff must show that "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." *WildEarth Guardians*, 795 F.3d at 1156 (quoting *Salmon Spawning*, 545 F.3d at 1226). For instance, in the NEPA context, plaintiffs may demonstrate redressability with a showing that the agency's ultimate decision could "could be influenced by the environmental considerations that NEPA requires an agency to study." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003) (citing *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001)).

Parties do not have standing to insist that procedural rules be followed simply for the sake of enforcing conformity with legal requirements.  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).  In order to have standing Plaintiffs must identify how their particular injury could be remedied if the Court remanded the agency's decision for additional procedure.  Plaintiffs cannot do that here.

1. **Remand and additional agency process cannot redress Plaintiffs' ultimate injuries**

Plaintiffs' ultimate injury is not that the proper procedures were not followed.  The specific injuries identified in the complaint are "Damage to the historic, cultural and natural resources" within the Dwyer area, ECF No. 223 at 5, 6, and "Damage to the sacred sites" within

the Dwyer area. *Id.* at 6. This damage is described in the complaint as consisting of tree cutting, "uproot[ing] the stumps of the previously-cut Douglas Fir trees, severely damaging and impacting the sacred burial grounds, and the Native American trail / Barlow Road. The expansion of pavement covered and damaged the Native American trail/ Barlow Road." *Id.* at 51.

There is simply no way that setting aside the agency's actions and remanding for additional procedure could lead to redress of these injuries. Federal Defendants could consult again with the SHPO under NHPA, or issue a second revised EA, but this could not inform a decision (that has already been made) to lessen the impact on trees that were already cut or an alleged Native American trail that was covered with pavement. *See Rattlesnake Coalition v. EPA*, 509 F.3d at 1102–03; *Or. Nat. Res. Council, Inc. v. Wood*, 52 F.3d 334 (9th Cir. 1995) (Table); *Friends of the Earth*, 576 F.2d at 1379; *Knaust v. Kingston*, 157 F.3d 86, 88 (2d Cir. 1998); *Salmon Spawning,* 545 F.3d at 1227; *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 5 (D.D.C. 2015).

Federal Defendants recognize this Court has held that Plaintiffs had standing to pursue their RFRA claim. ECF No. 312 at 4. However, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). And importantly RFRA provides, broadly, that a claimant may obtain "appropriate relief against a government" that has violated its provisions. 42 U.S.C. § 2000bb-1. In contrast, the APA provides only that a court may "hold unlawful and set aside agency action . . . ." 5 U.S.C. § 706(2); *see, e.g., Kandra v. United States*, 145 F. Supp. 2d 1192, 1205 (D. Or. 2001) ("Finally, even if plaintiffs could show a likelihood of success on the merits of their NEPA claim, they would not be entitled to an injunction. The APA authorizes the court to 'set aside, rather than compel,' agency actions. 5 U.S.C. § 706(2). Accordingly, the appropriate remedy would be to set aside the 2001 Plan and require Reclamation to prepare an EIS.").

Federal Defendants also recognize that an earlier ruling of this Court suggested redress was possible because the Court's general equitable authority could allow the Court to order ODOT to "remove offending portions of Highway 26." ECF No. 52 at 9. However ODOT has since been dismissed from the case. *See* ECF No. 131. At this juncture, ordering the Federal Defendants to "remove" or otherwise modify the highway is not possible without ODOT, the entity that owns and manages the highway.

It is fundamental that "[t]o establish causation and redressability, the plaintiff must show that 'the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision.'" *Friends of Santa Clara River*, 887 F.3d at 918 (quoting *WildEarth Guardians*, 795 F.3d at 1156). Plaintiffs cannot make this showing and thus lack standing.

## 2. Any relief would implicate non-party ODOT

A further barrier to redress is the non-party ODOT and their ownership over the highway. "There is no redressability, and thus no standing, where . . . any prospective benefits depend on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)).

Plaintiffs seek that "Defendants uncover the historic campground, restore it through appropriate plantings and landscaping, and return it to use for the religious purposes." ECF No. 223 at 38. This relief is not available under the APA. But even if it were, the Federal Defendants cannot unilaterally change the management of a highway within the right-of-way managed by ODOT, which has been dismissed as a defendant from this case and cannot be joined based on the State's sovereign immunity. *See* ECF No. 131; ECF No. 287 at 28-29 (describing ODOT's ownership of the highway). Because they can obtain no redress, Plaintiffs lack standing.

### E.      The project complied with all applicable law

Plaintiffs lack standing and are barred from bringing concerns they never raised in the administrative process or even in their Complaint. But even if these claims can be heard, they have no merit.  The Federal Defendants complied with all applicable law.

### 1.      The project complied with NEPA

NEPA provides for preparation of an EA to determine if federal action "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3(b), 1501.4(b).  An EA is a "concise public document . . .  that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement [EIS] or a finding of no significant impact [(FONSI)]."  40 C.F.R. § 1508.9(a)(1).  The Federal Defendants here complied with NEPA through their issuance of an EA and FONSI.  *See* FHWA-004954.

An interdisciplinary team of officials from ODOT, FHWA, and BLM spent years scoping the proposed turn lane, soliciting and reviewing public comment, and analyzing impacts to the human environment.  The resulting environmental review documents included a draft EA and then a Revised EA, with public input taken into account at each stage.  Following years of review the agencies concluded that the project would not have a significant impact on the environment and signed a FONSI on January 25, 2008.

The team that prepared the EA included experts in land use and planning, air quality, noise, archaeology, biological resources, forestry, noise, socio-economic resources and recreation, construction, traffic safety, geology, history, hydrology, water quality and wetlands. FHWA-004429, *see also* FHWA 000016.

Through years of work this team produced an EA that described the purpose and need of the project, analyzed numerous alternatives including a "no action" alternative, described environmental consequence and described mitigation measures meant to reduce the environmental impact.  The EA also included twenty-three technical reports on, for instance, archaeology, historic resources, and specifically, the potential impacts on Dwyer. FHWA-

004981.  This goes above and beyond what is required by NEPA and Plaintiffs' arguments to the contrary are not persuasive.

### a)  No EIS was required[2]

Despite this robust process and analysis, Plaintiffs argue "FHWA should have performed an EIS," rather than an EA."  ECF No. 331 at 24.  Plaintiffs ask the Court to second guess the agency's determination of whether the project would have a significant impact, and specifically what elements about the Dwyer area render it "unique."

Plaintiffs have made no convincing argument that the Federal Defendants were arbitrary and capricious to conclude the project's impacts were not significant.  Plaintiffs' argument is that the Dwyer area is unique because it was initially donated to protect a stand of large trees and some of these were removed as part of the project.  But an EIS is not per se required if an area contains unique characteristics. *See, e.g., Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1162 (9th Cir. 1998) (upholding EA for proposed action near area with unique characteristics and ecological resources). Rather, the agency need only consider these "unique" factors in assessing the proposed action's impacts, which the EA expressly did here.  Moreover, the agency staff is better equipped to determine what elements make the Dwyer site "unique" and the Court should defer to their expertise. *Lindberg v. U.S. Forest Serv.*, 132 F. Supp. 3d 1255, 1269 (D. Or. 2015) (quoting *N. Plains,* 668 F.3d at 1075).  The expert agency staff that compiled the REA determined that the lichens and vascular plants present at the site made it "unique" and analyzed the impacts on these unique resources.  No EIS was required.

---

[2] This argument was never raised in Plaintiffs' complaint, nor was it raised in the administrative process and is thus waived. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 785 (10th Cir. 2006).

### b) EA considered reasonable alternatives[3]

Despite never proposing any alternatives during the administrative process, Plaintiffs now argue that the agency should have considered "a steeper slope or retaining wall." ECF No. 331 at 26. As argued above, this argument is waived and it would be unfair to fault the agency for not considering an alternative Plaintiffs never proposed. Regardless, the alternatives analysis in the EA and REA is reasonable.

As the Ninth Circuit has stated, "[j]udicial review of the range of alternatives considered by an agency is governed by a 'rule of reason'" that is highly deferential. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citations omitted). Indeed, the Ninth Circuit has previously upheld EAs that considered only the agency's proposed action and a no-action alternative. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005); *N. Idaho*, 545 F.3d at 1153-54. Here the EA considered two alternatives in depth: a "no action" and "widen to the north," alternative. FHWA-004358-59. The EA also considered in less detail four other alternatives including splitting the highway through the Dwyer area, adding only one lane in the westbound direction, and attempting to reduce peak traffic. FHWA-004359, 004961. These discussions of alternatives contain maps, environmental impacts, and generally more than sufficient information to inform the public and agency decisionmakers. No more is required under NEPA.

### c) BLM need not duplicate FHWA's environmental review

When one agency prepares the environmental review, there is no need for other agencies involved in the larger action or project to duplicate that work. NEPA's regulations expressly provide for a lead agency to work with other state and federal agencies to conduct environmental review when more than one such agency is involved in the project. 40 C.F.R. §

---

[3] This argument is waived; to preserve claims regarding alternatives, plaintiffs must have "raised and identified" those alternatives. *N. Idaho Cmty.Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1156 n.2 (9th Cir. 2008) (per curiam).

1501.5. Courts routinely approve of agencies working together on environmental review

documents as contemplated by the regulations.  *See, e.g., LaFlamme v. FERC*, 945 F.2d 1124,

1130 (9th Cir. 1991) (holding that "it was not unreasonable for the Forest Service as a

cooperating agency to decline to prepare independently an EA or an EIS").

Here, FHWA was the lead federal agency and worked jointly with "an interdisciplinary

team" consisting of experts from ODOT and BLM.  FHWA-004353.  As contemplated by the

regulations, BLM was involved in scoping, FHWA-001980, and provided information and

analysis within its expertise. *See* 40 C.F.R. § 1501.6(b)(2)-(3). BLM also made staff available as

contemplated by 40 C.F.R. § 1501.6(b)(4): BLM realty specialists, environmental specialists,

recreation planners, natural resource specialists, botanists and others participated in preparation

of the EAs. FHWA-004429-30, BLM-000051.  BLM experts also contributed technical reports

within the agency's expertise. FHWA-004431.  The regulations simply do not require BLM to

prepare a separate EA for its portion of the larger project—indeed this would have been

unnecessarily duplicative, and contrary to the agency's guidance documents and practice.

Plaintiffs' arguments that BLM had to independently prepare an EA are not persuasive.

### d)  No supplemental EA was required

Finally, Plaintiff argue that a memo they sent after the completion of the REA should

have led to the Defendants "conducting a supplemental EA or EIS." ECF No. 331 at 28.  This

argument is waived because it was raised for the first time in this motion and is flawed for

several reasons.

Supplementation of an EIS required where "[t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its

impacts."  40 C.F.R. § 1502.9(c)(1)(ii); *Price Rd. Neighborhood Ass'n v. U.S. Dep't of

Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997).  New and relevant information rises to the level of

significance under NEPA regulations only where that information presents a "seriously different

picture of the likely environmental harms stemming from the proposed project." *Tri-Valley*

*CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (quoting *Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984)).

The Supreme Court has made clear that NEPA does not require an agency to supplement "every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information..." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373-74 (1989) (footnote omitted). Rather, agencies should apply a "rule of reason" to the decision to prepare a supplemental EIS. *Id.* at 373. This standard creates a high bar to the obligation to prepare a supplemental NEPA analysis. The listing of a threatened species in a project area, for instance, does not clear this bar where the agency's EIS already had taken a hard look at its action's impacts on the species. *See Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 344 (9th Cir. 1996).

This standard is not met here. Plaintiffs argue that a new NEPA analysis was required after Logan and Jones told FHWA in February 2008 that the project could "destroy[]" "American Indian cultural and religious sites." ECF No. 331 at 28. But Plaintiffs' allegations did not in fact raise "new" information. FHWA was aware of the rocks present in the area and had already consulted with Indian Tribes, who did not raise any concerns regarding cultural or religious sites. FHWA-002609, 003062-003064, 003178-003180, 003828-003832, 005674-005675, 006512-006523. None of those Tribes expressed any concerns with the Project. FHWA-005674-005675, 006572-006573. Nor did any of the numerous archaeologists who had specifically examined the project area for such sites and found no evidence of them. *See, e.g.*, BLM-000019. There was no need for a supplemental EA.

### 2.    The project complied with NHPA[4]

Plaintiffs also argue there was a "failure to perform any section 106 process," ECF No. 331 at 30, and a "failure to perform tribal consultation." *Id.* at 31. These arguments are belied by

---

[4] This argument too is waived. *See e.g, Karuk Tribe v.Karuk Tribe v. Kelley*, No. C 10-02039 WHA, 2011 WL 2444668, at *11 (N.D. Cal. June 13, 2011) (holding that when "Plaintiffs could

the administrative record that shows a robust NHPA process including a programmatic

agreement, ACHP-000006, archaeological and historic investigations and technical report,

FHWA-003332-62, the Oregon state Historic Preservation Office's concurrence with ODOT's

findings regarding the eligibility of potentially eligible properties, FHWA-003346-61, and the

concurrence of three separate tribes with this determination.  FHWA00-2609, 3062–64, 3178–

80, 3828–32, 5674–75, 6512–23. None of those tribes expressed any concerns with the Project or

how they were consulted.  FHWA-005674–75, 6572–73.

Section 106 requires federal agencies to consider the potential effects of projects they

carry out, financially assist, or permit ("undertakings"). 16 U.S.C. § 470f (2013).[5]  Because the

NHPA is a procedural statute, a reviewing court is not tasked with determining if the Federal

Defendants correctly decided whether a given project altered a historic site. *See Concerned

Citizens*, 843 F.3d at 906–08. Instead, a reviewing court must ensure only that the agency

followed the proper procedures and considered the factors it was supposed to consider.  *Id.*

CEQ regulations call for integration of NEPA requirements "with other planning and

environmental review procedures required by law or by agency practice so that all such

procedures run concurrently rather than consecutively." 40 C.F.R. § 1500.2(c). NHPA's

implementing regulations contain a corresponding suggestion that the NHPA process be

integrated with environmental review under NEPA.  *See* 36 C.F.R. § 800.8(a); *see also Apache

Survival Coal.,* 21 F.3d at 906.

Here, ODOT, FHWA, and BLM all worked together to undertake environmental and

historical review for the project under NHPA and NEPA. FHWA-004353. The EA and REA

both addressed impact on historic resources.  FHWA-004389-94. And pursuant to the

programmatic agreement (PA) discussed in more depth below, ODOT consulted with the SHPO

---

have, but did not challenge" defendants' NHPA conduct "during the administrative review
process . . . they are not entitled to judicial review of that aspect" of their claim).
[5] The NHPA has been recodified. Pub. L. No. 113-287, § 7, 128 Stat. 3094, 3272-73 (2014). This
brief and the administrative record refer to the earlier codification.

and tribal governments who all concurred with the finding that there were no historic properties affected. FHWA-004500.

ODOT also employed historical and archaeological experts to do site visits and studies of the area. FHWA-002410, 005150.  An archaeologist dug 38 probes and 83 scrapes but found "No prehistoric cultural materials." FHWA-002259.  ODOT also identified specific properties that may have been eligible for listing on the historic register in a "historical resources technical report" that identified historical resources in the area and provided a preliminary indication of whether they were likely to be eligible for listing on the historic register or not. FHWA-3335. Moreover, ODOT undertook a more specific in depth examination of the East Wemme Trail and its connection to the Barlow road. ACHP-000017-24. ODOT also examined the Mountain Air stone pillars and determined they were not eligible for listing.  *Id.*  No party including the consulted Tribes or the SHPO objected to ODOT's conclusion that the project would have "no effect" on historic resources, FHWA-003337, and the SHPO concurred with ODOT's conclusions regarding Wemme trail.

### a) Compliance with the programmatic agreement project satisfies NHPA

Under Section 106's implementing regulations, agencies are authorized to negotiate a programmatic agreement with the Advisory Council "to govern the implementation of a particular program . . . [w]hen nonfederal parties are delegated major decision-making responsibilities" or "[w]here other circumstances warrant . . . ." 36 C.F.R. § 800.14(b). Compliance with the procedures "established by an approved programmatic agreement satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement . . . ." 36 C.F.R. § 800.14(b)(2)(iii).   Such an agreement executed by the agency and SHPO is valid, regardless of whether consulting tribes are signatories to, or concur in, the agreement as the project is on non-tribal lands. 36 C.F.R. §§ 800.6(c)(2)(ii), (c)(2)(iv), (c)(3).. 36 C.F.R. §§ 800.6(c)(2)(ii), (c)(2)(iv),  (c)(3).

Consistent with these regulations, a PA was implemented in this case. ACHP-000006.

The PA provided for ODOT and FHWA to "coordinate historical and archaeological investigations, reviews, and consultations for Minor Transportation projects as a single process" in order to comply with NHPA and NEPA.  ACHP-000007.   The FHWA, ODOT, ACHP, and Oregon Preservation Officer agreed that the PA would "satisfy FHWA's section 106 responsibilities" for all undertakings covered by it.  *Id.*

The regulations are clear that compliance with the procedures in a PA "satisfies the agency's section 106 obligations."  36 C.F.R. § 800.14(b)(2)(iii).  *See, e.g.*, *Coyote Valley Band of Pomo Indians of Cal. v. U.S. Dep't of Transp.*, No. 15-CV-04987-JSW, 2018 WL 1587212, at *13 (N.D. Cal. Apr. 2, 2018).

Plaintiffs argue that by working with ODOT to initiate tribal consultations, the Federal Defendants violated NHPA.  Not so.  First, it is important to recognize that the Plaintiffs in this case are not the Tribes involved in this project and do not represent them nor have standing to vindicate their rights.  *See, e.g.*, *La Cuna De Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of Interior*, 642 F. App'x 690, 692–93 (9th Cir. 2016) ("'Tribal monitor' for Tribe, does not have standing to bring a claim for inadequate tribal consultation on behalf of the Tribe").  The Tribes who participated in this process were satisfied with it. Therefore, as argued below, even if there were a technical defect in the consultation process this would be non-prejudicial error.

Regardless, the PA expressly contemplates that ODOT will participate in "ongoing consultation" with federally recognized Tribes which "may include…specific project discussions, or simple notification, and will be consistent with coordination required under 36 C.F.R. § 800." ACHP-000012.  With regard to the government-to-government relationship between the Federal Government and Tribes, the PA notes that consultation will be "structured in accordance with each tribe's vision of effective consultation." ACHP-00013. Ultimately, if the Tribes were not satisfied with the consultation they could have requested to consult with the Federal Defendants rather than ODOT.  But while the government-to-government relationship is

between the Federal Government and Tribes, it is consistent with the regulations for State authorities to engage in Section 106 consultation with Tribes under a PA as occurred here.

### b)  BLM need not duplicate FHWA and ODOT's NHPA process

Plaintiffs also argue that BLM was required to conduct its own separate NHPA process, but this argument misreads the law and regulations.  Plaintiffs' argument is that "BLM's tree cutting permit and right-of-way grants were 'undertakings,' separate from and independent of the larger project.  ECF No. 331 at 30.  But an undertaking is defined, as relevant here, as "a project . . . requiring a Federal permit . . . ." 16 U.S.C. § 470w(7) (2013).  To state a tautology, the tree-cutting permit at issue here is the *permit*—not the underlying project requiring a permit.  The project requiring the permit—and hence the "undertaking" under NHPA—is the turn lane project itself. As already established, there was a thorough section 106 process for that undertaking.  A separate duplicative 106 process was not required.

### c)  Any technical noncompliance was harmless error

Finally, Plaintiffs note that the Yakama Tribe was consulted later than other Tribes—and this is correct. But as the Yakama expressed no concerns with the "no effect" finding, there was no prejudice.  *See* FHWA-002609, 003062-003064, 003178-80, 003828-003832, 005674-005675, 006512-006523, 006572-006573. Moreover, the public outreach and comment provided many opportunities for officials from the Tribe to express concerns had they wished to. There is no indication in the record that had the Yakama been consulted earlier they would have expressed any concern.  Therefore, the timing of the consultation was at worst a harmless error that was cured and resulted in Tribal consent to the project.[6]

The APA provides that, in reviewing agency action, the court "shall" take account of "the rule of prejudicial error," 5 U.S.C. § 706. The burden falls on the party asserting error to

---

[6] ODOT inquired with the Oregon Intertribal commission in 2005 about whether the Yakama should be consulted about the project and was advised they need not be consulted. FHWA-002970.

demonstrate prejudice. *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1091 (9th Cir. 2011).

Cases concerning untimely compliance with a regulation have applied this rule. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004). In such cases, when plaintiffs have "failed to identify any prejudice from the delay, no [judicial] action is warranted." *Hall v. U.S. EPA*, 273 F.3d 1146, 1163–64 (9th Cir. 2001); *see also Kolek v. Engen*, 869 F.2d 1281, 1286 (9th Cir. 1989). Plaintiffs can show no prejudice as ultimately the neither the Yakama nor any other Tribe expressed a concern over the project or consultation regarding it.

### 3.  The project complied with FLPMA[7]

The Federal Land Policy and Management Act ("FLPMA") directs BLM to "develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). These land use plans are usually in the form of a Resource Management Plan (RMP). An action that violates the RMP's binding direction is also a violation of FLPMA and its implementing regulations. *Klamath-Siskiyou Wildlands Ctr. v. Medford Dist. of BLM*, 400 F. Supp. 2d 1234, 1241 (D. Or. 2005).

Pursuant to FLPMA, in 1995 BLM issued the Salem District Resource Management Plan (the "1995 RMP"), https://www.blm.gov/or/plans/files/salem_rmp.pdf (last accessed Mar. 8, 2019). At the time of the agency decisions challenged here, all lands relevant to this case were managed under provisions of the 1995 RMP.

### a)  Plaintiffs are barred by the statute of limitations from facially challenging the 1995 Resource Management Plan

Plaintiffs argue that "BLM violated FLPMA by failing to develop the [1995 RMP] in accordance with legally required information-gathering procedures." ECF No. 331 at 45. BLM

---

[7] As discussed above, FLPMA arguments are waived because they were not raised in the administrative process nor in Plaintiffs' complaint. *See, e.g., W.W. Watersheds Project v. BLM*, 971 F. Supp. 2d 957, 967 (E.D. Cal. 2013) (determining that participation in administrative procedure required under FLPMA but plaintiffs had satisfied the requirement).

finalized the RMP through a record of decision issued in May 1995. Plaintiffs filed this suit in October of 2008, more than thirteen years later. The statute of limitations for civil actions against the United States is "six years after the right of action first accrues." 28 U.S.C. § 2401(a); *see, e.g.*, *Shasta Res. Council v. U.S. Dep't of Interior*, 629 F. Supp. 2d 1045, 1054 (E.D. Cal. 2009). The claim is thus untimely, and also barred by laches and administrative wavier as it was never raised in the administrative process.

### b) Tree removal was consistent with the Resource Management Plan

BLM permitted ODOT to remove certain trees in the right-of-way. Plaintiffs argue this permit violated the 1995 RMP's binding direction for BLM's management of the land. This claim fails because the incidental cutting of trees to promote the safety of the highway expansion was not a "timber harvest" within the meaning of the RMP.

Under the 1995 RMP, much of the land managed by the Salem District was identified as "Matrix" land, with relatively mild limitations on commercial timber harvest. *See* 1995 RMP at 8, 46. The Dwyer area is listed in the 1995 RMP as a "Special Area" outside the RMP's more typical land use allocations. *Id.* at 34, Table 2. The table describing this area establishes "timber harvest" is not allowed. *Id.* Otherwise, the 1995 RMP does not establish any restrictions on BLM's management of this Special Area.

The 1995 RMP does not define the term "timber harvest." But the meaning is clear from context: timber harvest is meant to refer to the commercial removal of trees for sale. In the description of BLM's rationale for adopting the RMP, "timber harvests and jobs" are identified as a primary rationale for adopting the RMP. *Id.* at 2. In the direction for management of "Matrix" lands, BLM distinguishes between "timber harvest and other silvicultural activities," which suggests that not all silvicultural activities are also "timber harvest." *Id.* at 21. Similarly, the direction for Matrix lands includes a section titled "Timber Harvest and Site Preparation," which discusses the district's goal of commercially harvesting millions of board-feet of timber per year. *Id.* at 46. Finally, Appendix C to the 1995 RMP includes a section describing Best Management Practices for "Timber Harvest" that clearly contemplates large-scale commercial

operations.  *Id.*  Appendix C-1 to C-6.

BLM did not permit timber harvest – ie, a timber sale – through the tree cutting permit in this case.  Instead, the trees were only cut for the purpose of facilitating the highway expansion and the highway's safe operation.  BLM-000033. The timber from the downed trees was not sold, but remained federal property and was instead used for a habitat restoration project. The permit, under these terms and with these purposes, did not violate the 1995 RMP's restriction against timber harvest in Dwyer and other Special Areas.

Plaintiffs argue that the 1995 RMP's prohibition on "timber harvest" in Dwyer was really meant to be a prohibition on all tree cutting, rather than a restriction on timber sales.  This would lead to absurd results.  If the direction were this restrictive, BLM would be unable to remove hazard trees that threaten life or property.  It would be unable to remove fuel to reduce fire risk, even if doing so would ultimately protect the values that justified an area's designation as a Special Area in the first place.  And it would be unable to conduct non-commercial thinning for silvicultural purposes, to promote the growth of other trees and the development of habitat for special status species.  Even in Congressionally-designated wilderness and national parks these tools are available to land managers and it is inconceivable that BLM meant to flatly deny itself the discretion to cut down any trees under any circumstances in the >7000 acres of Special Areas to which the "no timber harvest" restriction applies in the 1995 RMP.  *See* 1995 RMP at 34-35, Table 2.

Plaintiffs also argue that the tree cutting permit was not justified by the use of the "salvaged" cut trees for fish habitat restoration because the 1995 RMP "does '*not* in any way relax its' prohibition on 'timber harvest' within Dwyer ' for salvage operations.'"  ECF No. 331 at 44 (quoting *Or. Nat. Res. Council Fund v. Brong (ONRCF)*, 492 F.3d 1120, 1126-27 (9th Cir. 2007)).  This argument is misplaced for several reasons.  First, it is a strawman:  BLM never

characterized the tree cutting here as a salvage operation, and it is not one.[8]  Second, Plaintiffs'

citation to *ONRCF* for specific management direction is misleading.  That case had nothing to do

with Dwyer's management direction; instead, it evaluated BLM's conformance with the

management direction for Late-Successional Reserves set up for the benefit of wildlife species.

Plaintiffs' claim that the tree removal constituted "undue degradation" also misses the

mark.  FLPMA provides that, in managing the public lands, BLM shall "take any action

necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).  This

Circuit has found that how to achieve this broad mandate is within the discretion of BLM. *See*

*Gardner v. BLM*, 638 F.3d 1217, 1222 (9th Cir. 2011) (FLPMA did not specify precisely how

BLM was to meet this objective); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923,

933 (9th Cir. 2010).  Plaintiffs cannot demonstrate that BLM abused its discretion in allowing

the tree removal.

### c)  Tree removal was consistent with ORCA

Plaintiffs additionally raise a claim under ORCA, Pub. L. No. 104-208, 110 Stat. 3009,

3009-523 (Sept. 30, 1996). ORCA does not categorically prohibit timber cutting, as Plaintiffs

suggest.  Indeed, the provision Plaintiffs rely on expressly provides that "Timber cutting *may* be

conducted on Mt. Hood Corridor lands following a resource-damaging catastrophic event," and

then provides limitations on "such cutting."

Nowhere in the act does it say that timber cutting may "only" occur following a

catastrophic event. Nor does the law say that cutting "shall not" occur or "shall be prohibited" in

Corridor lands.  Plaintiffs misleadingly add a crucial word—"except"—that is simply not present

in the law.  *Compare* ECF No. 331 at 41 *with* Pub. L. No. 104-208 § 401(h).  Significantly,

elsewhere in the same law, Congress did expressly prohibit timber cutting—what Plaintiffs

incorrectly read the law to do here.  For instance, § 604(a) provides "the Secretary of Agriculture

---

[8] A salvage operation is the removal, typically by sale, of trees after a catastrophic event to
remove hazards or fuel, and to obtain value from trees that would otherwise go to waste.  *See*
1995 RMP at 46

Shall prohibit cutting of trees in [area]."  Similarly, § 105(f) provides "the Secretary shall prohibit the cutting and/or selling of trees in [area]."   In light of these clear differences Plaintiffs' reading of the ORCA is not tenable.  BLM complied with the law by managing the area consistent with the RMP, "primarily for the protection or enhancement of scenic qualities." That the area is "primarily managed" for scenic qualities does not mean that no tree can ever be removed.

### d)  O&C Tramroads regulation is inapplicable

Plaintiffs also cite an inapplicable portion of a regulation pertaining to "Tramroads and Logging roads" to argue that ODOT was required to pay the "stumpage value" of the timber removed from the right-of-way, despite the fact there was no sale of timber, no "stumpage value" and the trees were ultimately used by BLM for wildlife habitat. ECF No. 331 at 44.

Plaintiffs cite 43 C.F.R. § 2812.5-1, part of a larger "Tramroads and Logging Roads" regulation.  The section defines these roads as "tramways, and wagon or motor-truck roads to be used in connection with logging, and the manufacturing of lumber . . . ." 43 C.F.R. § 2812.0-5(f). The regulations provide for "[a]n application for a permit for a right-of-way" filed under the regulations to meet certain criteria, *id.* § 2812.1-1, including payment of a yearly per-mile fee, *id.* § 2812.5-2, and "in advance of the issuance of the permit, the full stumpage value as determined by the authorized officer of the estimated volume of all timber . . . . " *id.*  § 2812.5-1.   In a section titled "Nature of Permit" the regulation describes the permit as "merely nonexclusive licenses to transport forest products owned by the permittee." *id.* § 2812.2-1.

The right-of-way here was not granted under this section, which is clearly inapplicable. BLM-000011. The deed instead states that the grantee filed an application under 23 U.S.C. § 317 which expressly provides for use of federal lands for highway purposes, including "projects constructed on a Federal-aid highway . . . ." *Id.*  This provision contains no stumpage fee provisions.  In sum, the O&C tramroads regulation is simply inapplicable here.

### e) Non-binding Executive Order 13007 is not implicated

Executive Order 13007 provides that agencies shall, "to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites."

By its own text, the Executive Order "is intended only to improve the internal management of the executive branch" and does not create any right "enforceable at law or equity by any party against the United States, its agencies, officers, or any person." Exec. Order No. 13007 § 4, 61 Fed. Reg. 26,771 (May 24, 1996); *see Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688-89 (D.C. Cir. 2004) (executive order did not create a private right of action).

The Executive Order defines "sacred site" as

any specific, discrete, narrowly delineated location on Federal land that is identified by an Indian tribe, or Indian individual determined to be an appropriately authoritative representative of an Indian religion, as sacred by virtue of its established religious significance to, or ceremonial use by, an Indian religion; provided that the tribe or appropriately authoritative representative of an Indian religion has informed the agency of the existence of such a site.

Exec. Order No. 13007 § 1(b)(iii).

Even if the EO were binding, it is not implicated here. No Tribe identified the Dwyer area as sacred—indeed they expressed no concerns when consulted. Nor did any "appropriately authoritative representative of an Indian religion" identify the Dwyer area as a sacred site during the administrative process.

Plaintiffs discuss at length the communications Plaintiff Jones had with ODOT in the 1990s. ECF No. 39. But Plaintiff Jones is not a Tribal member and there is no information in the record to suggest he is an authoritative representative of a Native American religion. His communications do not allege he represents any religion.

Nor did Plaintiff Logan, who is a member of a Federally-recognized Tribe, communicate to the Federal Defendants that she was an "authoritative representative." Indeed, Plaintiff

Logan's Tribe clarified to Federal Defendants that she did not speak for the Tribe. FHWA-005652, 6910–11. This case is thus similar to *South Fork Band v. U.S. Dep't of Interior*, No. 3:08-CV-00616-LRH-RAM, 2010 WL 3419181 (D. Nev. Aug. 25, 2010). There, court found that "there has been no showing that [the individuals who submitted declarations to BLM] are 'appropriately authoritative representative[s]' of their religions . . . ." *Id.* at *9 n.7.

Moreover, as in *South Fork Band*, in the few communications Plaintiffs provided after the administrative process they did not "specifically identify" the site in question as "significant to the tribes' religious practices." *South Fork Band*, 2010 WL 3419181, at *9. In South Fork Band, the statements the Court found insufficient "refer[red] generally to "the Mt. Tenabo area." *Id.* Similarly here, Plaintiff Logan's untimely fax refers to "American Indian cultural and religious sites" in the 'Dwyer Memorial Forest.'" FHWA-5477. But the Dwyer area is several acres, most of which was not affected by the project. Plaintiff Logan could have specified that the particular area within ODOT's existing highway right of way in which the turn lane was to be built was a sacred site, but did not do so.

Plaintiffs attempt to rely on documents created years after the administrative process, but these declarations are clearly outside the record and thus it would be unfair and inconsistent with the APA to fault the Federal Defendants for not considering them. As argued in the concurrently-filed Motion to Strike these extra-record declarations should not be considered in determining compliance with FLMPA. There is nothing in the administrative record that shows a violation of Executive Order 13007.

### 4.    The project complied with the DTA[9]

Section 4(f) of the DTA constrains the Secretary of Transportation's authority to approve transportation projects that "requir[e] the use of any publicly owned land from a public park,

---

[9] Because Plaintiffs never raised this issue during the administrative process, it too is waived. *See Beverly Hills Unified Sch.See Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 12-9861-GW(SSX), 2016 WL 4445770, at *1 n.1 (C.D. Cal. Aug. 12, 2016) ("Plaintiffs' claims under Section 4(f) [are] waived by their failure to timely raise/exhaust the issue.").

recreation area, or wildlife and waterfowl refuge, [or historic site] of national, State, or local

significance . . . ." 23 U.S.C. § 138(a); 49 U.S.C. § 303(c). "Significance" is "determined by the

Federal, State, or local officials having jurisdiction over the park, area, refuge, or site." *Id*.

FHWA regulations implementing Section 4(f) are contained in 23 C.F.R. part 774 and it

has issued voluminous guidance on the topic, including the 4(f) Policy Paper "to aid FHWA

personnel with administering Section 4(f) in a consistent manner." Fed. Highway Admin.,

Section 4(f) Policy Paper (2012), § 1.1 (hereinafter, "4(f) Policy Paper").[10]

Plaintiffs' brief misquotes this guidance which actually states:

Publicly owned land is considered to be a park, recreation area or wildlife and waterfowl
refuge when the land has been officially designated as such by a Federal, State or local
agency, *and* the officials with jurisdiction over the land determine that its primary
purpose is as a park, recreation area, or refuge.

4(f) Policy Paper, Q.1A (emphasis added; Plaintiffs' brief incorrectly says "or").

As the record shows, FHWA complied with 4(f) based on the information it had at the

time the project was developed. Plaintiff contends that land occupied by the selected alternative

(Widen North) is "public park" or "recreation area" protected by 4(f) and FHWA's failure to

avoid its use without adequate 4(f) analysis violated the law. ECF No. 331 at 47. The record

contradicts this argument and in fact shows the area was not managed as a park, nor considered

by BLM to be a park of "national, state, or local significance."  BLM deserves deference in its

interpretations of the uses of land it administers and the significance of this land, and FHWA

acted reasonably in accepting BLM's determination of significance.

FHWA properly concluded based on the evidence before it that the property in question

did not meet the criteria for 4(f) eligibility.  *See* FHWA-006169, 003470, 005784, and 006169.

Rather, the area in question, the AJ Dwyer *Scenic* Area, was managed by BLM for "scenic

purposes" and was "NOT used for any recreation purposes due to its isolation from the majority

---

[10] Available at https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx (last
accessed Mar. 6, 2019).

of the recreation area on the south side of the highway." FHWA-006169, BLM-00076. It had been viewed this way since the original road was constructed in the 1980s. FHWA-000479, 000199-204, 003470.  The only support Plaintiffs use to support of their position is comments submitted on the 1987 EIS for a different project. 000584, 000587-589. They have no weight in this project and cannot overcome the reasonable conclusions of the expert agencies involved.

<h3 style="text-align:center">5.      The project did not implicate NAGPRA</h3>

No human remains were ever discovered at Dwyer, including during the construction of the turn lane. Nor were any associated "funerary objects" or "cultural items."  An arrangement of rocks of uncertain age and origin ("rock cluster") was discovered in 1986, but was no longer intact when the project was constructed in 2008. ECF No. 223 at 41.  Regardless, even if the 1986 rock cluster is considered to be a "funerary object" or "cultural item," because it was discovered before NAGPRA was passed, it is not implicated by the Act.  Plaintiffs' unproven assertion that the area contains Native American graves is not sufficient to invoke the Act; NAGPRA is simply not implicated here.

NAGPRA establishes the rights of Indian tribes and lineal descendants to obtain repatriation of human remains and associated items, from federal agencies and museums, and protects cultural items either intentionally excavated from or inadvertently discovered on federal public lands and tribal lands after 1990. 25 U.S.C. §§ 3001-3013.

When implicated, NAGPRA triggers a two-step analysis: the first inquiry is whether the objects or remains are actually Native American cultural items within the statute's meaning; if the items do not qualify, then NAGPRA does not apply.  *Bonnichsen v. United States*, 367 F.3d 864, 875 (9th Cir. 2004) (adjudicating the disposition of Native American remains, which are "cultural items" within NAGPRA's definition). The first step in that analysis is subject to the APA's standard of review, and the determination that remains or objects are (or are not) "cultural items" within NAGPRA's definition may be set aside if arbitrary and capricious.  *Id*. at 874-75. For instance, where the Secretary of the Interior concluded without "substantial evidence" that Kennewick Man's remains were Native American (and thus subject to NAGPRA), the Ninth

Circuit set aside the decision as arbitrary and capricious. *Id.* at 879-80. Additionally, because Plaintiffs never raised any concerns regarding NAGPRA during the administrative process, they should be barred from doing so in litigation.

### a) NAGPRA's regulations bar Plaintiffs' claims

In a paragraph titled "Who has standing to make a claim under these regulations?" NAGPRA's regulations make clear that only three discrete groups can bring a NAGPRA claim of the type Plaintiffs raise here. One such group is a Native Hawaiian organization which is not implicated here, and the others are (1) lineal descendants of a known Native American individual whose remains or objects were found or (2) Indian Tribe officials. 43 C.F.R. § 10.2(b). Plaintiffs are in neither category.

In order to be a "lineal descendant" an individual must trace their ancestry "directly and without interruption . . . to a known Native American individual whose remains, funerary objects, or sacred objects are being claimed under these regulations." *Id.* § 10.2(b)(1). Despite numerous archaeological investigations no remains were ever found at Dwyer, nor is there any other evidence that ties any object to a "known native American individual." And Plaintiffs have never claimed that they are a direct descendant from such an individual. Therefore, Plaintiffs cannot be "lineal descendants" as that term is defined in the regulations.

Nor is any Plaintiff an "Indian tribe official" which is defined as "the principal leader of an Indian tribe . . . officially designated by the governing body of an Indian tribe. . . as responsible for matters relating to these regulations." *Id.* § 10.2(b)(4). Not only was no Plaintiff designated by a Tribe, the appropriate officials within the Tribes of which Plaintiffs are members all were consulted about the project and expressed no concerns. *See* FHWA-002609, 003062-003064, 003178-003180, 003828-003832, 005674-005675, 006512-006523; 006572–006573. After Plaintiff Logan (a member of the Grande Ronde tribe) raised concerns, her tribe stated that she did not speak for it, that it was satisfied with consultation, and that her views should not be confused with its views. FHWA-005652, 6910–11. NAGPRA's regulations bar Plaintiffs' claim.

### b) The rock cluster was discovered before NAGPRA's enactment and thus the law does not apply to it

Even if Plaintiffs could bring a NAGPRA claim, the rock cluster was discovered in 1986 and NAGPRA imposes obligations on "[a]ny person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands *after November 16, 1990*." 25 U.S.C. § 3002(d) (emphasis added). Similarly, the regulations define "person" for purposes of the act as "any official, employee, agent, department, or instrumentality of the United States . . . that discovers or discovered human remains, funerary objects, sacred objects or objects of cultural patrimony on Federal or tribal lands *after November 16, 1990*."). 43 C.F.R. § 10.2(a)(5) (emphasis added); *see Geronimo v. Obama*, 725 F. Supp. 2d 182, 186–87 (D.D.C. 2010). It is not disputed that the rocks at Dwyer were discovered by BLM no later than 1986 as documented by BLM archaeologist Frances Philipek. FHWA-000302. Therefore, NAGPRA's inadvertent discovery provisions do not apply to the rock cluster at Dwyer.

### c) Neither human remains nor associated funerary objects were inadvertently discovered

Even if the discovery of the rock cluster at Dwyer did not predate the Act, they would still not be covered by it. As relevant here, NAGPRA imposes requirements on "[a]ny person who knows or has reason to know that he or she has discovered inadvertently human remains, funerary objects, sacred objects, or objects of cultural patrimony" on federal lands. 43 C.F.R. § 10.4(b). Inadvertent discovery means "unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found" on federal lands. 43 C.F.R. § 10.2(g)(4).

Plaintiffs' argument is that the Federal Defendants knew they had discovered items covered by NAGPRA. ECF No. 331 at 52. Human remains have never been discovered at Dwyer, and so the only way NAGPRA could be triggered is if the record showed that the Federal Defendants knew they had inadvertently discovered "funerary objects, sacred objects, or objects of cultural patrimony" within the meaning of NAGPRA. They did not.

Funerary objects are defined as "items that, as part of the death rite or ceremony of a

culture, are reasonably believed to have been placed intentionally at the time of death or later with or near individual human remains." 43 C.F.R. § 10.2(d)(2). The record here does not support a "reasonable belief" that human remains and objects placed intentionally near them were found in Dwyer. At least four archaeologists concluded that no human remains were present. FHWA-000302-12, 000305; *Id.* at 305 and 310, 2411-51; BLM-000006. Moreover, the consulted Tribes were satisfied that the project did not impact any cultural items and did not mention the possibility of human remains at the site. *See* FHWA-002609, 3062–64, 3178–80, 3828–32, 5674–75, 6512–23, 5674–75, 6572–73.

Nor did Federal Defendants know of the inadvertent discovery of "sacred objects," defined as "items that are specific ceremonial objects needed by traditional Native American religious leaders . . . ." 43 C.F.R. § 10.2(d)(3).

The fact that the relevant Tribes who were consulted had no objections to the project is strong evidence that the Tribes' "religious leaders" did not consider the rocks at the Dwyer area to be necessary "specific ceremonial objects." *See* FHWA-002609, 3062–64, 3178–80, 3828–32, 5674–75, 6512–23, 5674–75, 6572–73. For this same reason, the rocks at Dwyer cannot be "objects of cultural patrimony," which are narrowly defined as "items having ongoing historical, traditional, or cultural importance central *to the Indian tribe…itself.*" 43 C.F.R. § 10.2(d)(4) (emphasis added).

Plaintiffs attempt to rely on extra-record hearsay that was not before the Federal Defendants during the administrative process. *See* ECF No. 331 at 53. As elaborated further in the concurrently filed motion to strike, the declarations Plaintiffs produced for this lawsuit, years after the administrative process, are not appropriate to consider in this APA case to show the Federal Defendants knew they had inadvertently discovered cultural items. But regardless, even if taken at face value these excerpts from depositions and declarations to not show that anyone, including Plaintiffs, told the Federal Defendants that they were traditional religious leaders and the rocks at Dwyer as specific ceremonial objects before the project was constructed. In sum, NAGPRA is not implicated here.

###### 6.    The project does not violate the free exercise clause

In this Circuit, to state a free exercise claim, a plaintiff "must show that the government action in question substantially burdens the [plaintiffs] practice of [their] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015); *Boyd v. Etchebehere*, No. 17-16750, 2018 WL 3569027, at *1 (9th Cir. July 25, 2018) (mem.) (same); *Stidhem v. Schwartz*, No. 2:15-CV-00379-TC, 2017 WL 6887139, at *3 (D. Or. Oct. 23, 2017), *report and recommendation adopted*, No. 2:15-CV-00379-TC, 2018 WL 358496 (D. Or. Jan. 10, 2018).

This Court has previously decided the issue of whether Plaintiffs' religious exercise has been "substantially burdened" as a matter of law.  ECF No 300; ECF No. 312. The Ninth Circuit has held that a plaintiff's "failure to demonstrate a substantial burden under RFRA necessarily means that [it has] failed to establish a violation of the Free Exercise Clause, as RFRA's prohibition on statutes that burden religion is stricter than that contained in the Free Exercise Clause." *Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008) (per curiam). Given that Plaintiffs' RFRA claim has already been dismissed by this Court, their free exercise claim cannot succeed.

Nonetheless, Plaintiffs seek to argue that the construction of the turn lane was not a "neutral" action, and compare it to an ordinance that was motivated by animus towards a certain religion.  *See* ECF No. 331 at 55 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah (Lukumi)*, 508 U.S. 520 (1993)). There is no evidence that the highway turn lane in this case was constructed to specifically target any religion.  The action is subject only to rational basis review, and is rationally related to the government's interest in promoting highway safety. FHWA-4957.

In *Lukumi*, the Court elaborated on the Free Exercise Clause caselaw's distinction between "neutral [laws] of general applicability" which need only withstand rational basis review, and those that are not neutral and "must be justified by a compelling government interest and must be narrowly tailored to advance that interest." 508 U.S. at 531-32. *Lukumi* explained

that a law is not neutral or generally applicable if the State has "attempt[ed] to target . . . religious practices."  *Id*. at 535; *see also id*. at 524 (noting that laws have an "impermissible object" where they apply "only with respect to conduct motivated by religious beliefs").

Plaintiffs' alleged evidence that the highway turn lane at issue here was not neutral but in fact "targeted" their religion is that the project used a steep slope to avoid a wetland, but not to avoid the portion of the Dwyer area they believe is religious significant.  ECF No. 331 at 56.

Factors relevant to the assessment of governmental neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body."  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540).  Here, there are no statements, legislative history, or any information whatsoever indicating an intent by agency decisionmakers to target Plaintiffs' religious exercise. Rather, the historical background and series of events leading to the decision point to a much more obvious explanation for why a wetland was protected but the area of concern to Plaintiffs was not: Plaintiffs did not make their religious concerns known during the administrative process.  It is apparent from the record that the Plaintiffs never participated in the administrative process and as a result never informed the agency decisionmakers that a particular slope or any other mitigation was needed to protect their religious exercise.

Plaintiffs point to two documents in the record that they claim show the Plaintiffs "repeatedly informed" decisionmakers about the religious nature of the Dwyer site during the administrative process.  The documents do not show this.  First, both documents were received in February and March 2008, after environmental review had concluded, and indeed years after the

first public meeting regarding the project and two years after the draft EA—showing the agency's "widen to the north" plan, including its slope—was made public. But even had Plaintiffs' few submissions been timely, neither document proposes a steep slope or any other specific alternative to the approach the agency announced years earlier. Nor does either document identify any particular religious exercise that would be impacted in anything close to specific enough detail for the agency to have taken this information into account. Even if timely, they are much too vague to effectively put the Federal Defendants on notice.

The case is thus similar to *Standing Rock*, where the Court recognized that during the administrative process the plaintiff had made comments "some of which alerted the Corps in general terms that [the project] might affect sacred sites." *Standing Rock*, 239 F. Supp. 3d at 85. But the plaintiff did not articulate the concern that they raised in their lawsuit with specificity that would have allowed the agency to understand or address the concern. *Id.*; *see also Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (1973).

The Free Exercise caselaw is clear that if a law is of general application and is not targeted at religion, it is subject only to rational basis scrutiny, even though it may have an incidental effect of burdening religion. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031-32 (9th Cir. 2004); *Lukumi*, 508 U.S. at 535 (An "adverse impact will not always lead to a finding of impermissible targeting."). Such is the case here. The turn lane was "neutral" towards religion and in no way built to target Plaintiffs' religious exercise. Under rational basis review, a law will pass constitutional muster unless it is not rationally related to a legitimate governmental interest. *Id.* Here, the governmental interests of highway safety, FHWA-4957, is a legitimate government interest sufficient to survive rational basis review.

## IV.    Conclusion

For the foregoing reasons, Summary Judgment should be granted for Federal Defendants.

Respectfully submitted on March 8, 2019

JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

By: */s/ Reuben Schifman*
**REUBEN SCHIFMAN**
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-4224
reuben.schifman@usdoj.gov

BILLY J. WILLIAMS, Oregon State Bar No. 901366
United States Attorney
**TIM SIMMONS**, Oregon State Bar No. 924615
Assistant U.S. Attorney
tim.simmons@usdoj.gov
United States Attorney's Office

District of Oregon
405 E. 8th Ave., Suite 2400
Eugene, OR 97401
Telephone: (541) 465 -6740
Facsimile: (541) 465 -6917

*Attorneys for Federal Defendants*

## LOCAL RULE 7-1 CERTIFICATION

Federal Defendants' counsel certifies that they have conferred with counsel for the Plaintiffs regarding the substance of this motion. The parties were unable to resolve the issue without motions practice.


## CERTIFICATE OF SERVICE

I, Reuben S. Schifman, hereby certify that on March 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.


*/s/ Reuben Schifman*
REUBEN S. SCHIFMAN